686 A.2d 356

PETER CAPUTA AND PATRICIA CAPUTA, HIS WIFE, PLAIN-TIFFS–APPELLANTS, v. LEONARD ANTILES, M.D., THE MOUNTAINSIDE HOSPITAL, AND JOHN DOES (1–10), DEFEN-DANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 11, 1996—Decided December 24, 1996.

Before Judges SHEBELL, PAUL G. LEVY and BRAITHWAITE.

*Bruce H. Nagel* argued the cause for appellants (*Nagel, Rice & Dreifuss,* attorneys; *Mr. Nagel,* of counsel; *Bruce H. Nagel* and *Robert H. Solomon,* on the brief).

*Scott B. Piekarsky* argued the cause for respondents (*De Yoe, Heissenbuttel & Mattia,* attorneys; *Mr. Piekarsky,* of counsel, and on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

In this medical malpractice action, tried before a jury, plaintiffs, Peter Caputa and his wife, Patricia, asserted negligence and lack

of informed consent claims against defendant, Dr. Leonard Antiles, arising out of the care and treatment of Peter's kidney stone. The plaintiffs' motion for a directed verdict at the end of the case on the lack of informed consent claim was denied. After the return of a verdict of no cause for action by the jury, plaintiffs filed a motion for a judgment notwithstanding the verdict or alternatively for a new trial. By order dated July 10, 1995, the trial judge denied the motion. This appeal followed.

On March 12, 1990, Peter Caputa (plaintiff) experienced pain in his back and side. The pain was intermittent and continued until March 17, a Saturday night, when the pain became severe for a number of hours and the plaintiff became nauseated and vomited. The next morning he was still feeling pain, although not as severe as the night before, and his wife drove him to the emergency ward at Mountainside Hospital.

Plaintiff arrived at the emergency room at 6:00 a.m., where a doctor took his history, blood pressure, urine specimen and x-rays. Plaintiff did not have a fever and no blood was seen in his urine. The emergency room doctor recommended defendant, Antiles, a urologist. While still in the emergency room, and before he had met defendant, plaintiff signed a surgical consent form handed to him by a nurse. Plaintiff was admitted, and that afternoon defendant saw plaintiff for the first time and told him that he had a kidney stone lodged in his urethra tube, and that it should come out. The radiology report described the stone as less than four millimeters in size.

Surgery was performed by defendant late in the day on Monday, March 19. Plaintiff testified that he was not given the option of observation as opposed to intervention before consenting to the surgery. Defendant admitted he never gave the plaintiff any treatment option other than surgery. Defendant testified in his deposition testimony, which was read to the jury:

Q. What were the options that you discussed with Mr. Caputa?

[Defendant]. Really, I don't remember.

Q. What are the options that in your usual and customary practice would you have offered to a patient like Mr. Caputa?

A. In this specific instance, I don't think there was much in the way of option to offer. This man is sick, he's hurting. This is a good stone that hasn't passed for a week's time. The only good option is to do what I did for him. In the setting that I saw, I thought there were no other options.

Q. Did you tell Caputa that?

A. Yes.

The defendant also responded on cross-examination at trial:

Q. Did you tell him, did you tell him that if the stone is four millimeters or less, 90 percent of the time it passes spontaneously, so I'm going to send you home and observe you, did you tell him that?

A. Absolutely not.

Q. You didn't tell him that because you believed that he had no options except surgery, isn't that correct?

A. That's correct.

Defendant disclosed to plaintiff in the recovery room after surgery that the stone was not removed. Therefore, the next day, plaintiff had a second operation by another surgeon, who placed wires through plaintiff's back into his kidney in preparation for a third surgery, which would approach the stone in a different way.

On Thursday, March 22, the plaintiff was placed under general anesthesia. When he woke up he was told that most of the stone had been removed but that there were still fragments left in his urethra tube. The defendant also informed him that he had placed a stent or tube through the urethra, from his kidney to his bladder. The purpose of the stent was to allow flushing out of any particles that were left. Defendant informed him to make an appointment and that he would remove the stent in his office in about one and a half to two weeks. Plaintiff remained in the hospital until Sunday, experiencing pain in his back and side.

On April 5, the plaintiff went to defendant's office. The defendant used a syringe and injected an anesthetic into the plaintiff's penis, after which the defendant inserted a long metal rod, through which he inserted another object in an attempt to withdraw the stent. The procedure lasted about a half hour, with plaintiff fully conscious. He was unsuccessful in removing the

stent, but did remove the tube that had been in the plaintiff's back since the second operation.

Defendant informed plaintiff he would have to go back to the operating room as an outpatient, under general anesthesia. On April 13, defendant again attempted to remove the stent, but was unsuccessful. He informed plaintiff the stent had migrated higher up in the urethra than it should have and was not down by the bladder where the doctor would have been able to more easily remove it. Plaintiff remained in the hospital because of urinary tract bleeding. He suffered from pain in his side, back and below his naval in front. He was released on April 17.

On April 19, plaintiff, while sitting at home, experienced terrific pain. He felt the need to relieve himself and saw blood in his urine. His wife drove him to the emergency room. He was unable to urinate, and a catheter was placed inside his penis and what appeared to be blood flowed out of the tube. The plaintiff described this as very painful.

Defendant did not see plaintiff until the next day, when he told plaintiff they were still unable to remove the stent. Plaintiff was told that the next procedure would involve placing the wires in his back as had been done during the second operation. This was carried out by another surgeon. Defendant spoke to plaintiff the next day and told him that they would try to remove the stent again. The next day, defendant tried and again failed. Defendant told plaintiff he was to go home for about three months so he could heal. Plaintiff was then to call and make an appointment.

After a few days, plaintiff decided to get a another opinion. He called a doctor at Mt. Sinai Hospital in New York, and was told to send his medical records and x-rays. Plaintiff went to the doctor on June 2, and the stent was successfully removed on June 5, 1990.

The plaintiff continues to experience occasional pain and claims to have been limited in his physical and sexual activities, as he has bled about five or six times since the Mt. Sinai surgery. Plaintiff claims that if he had first been given the option of allowing the

stone to pass without surgery, he would have chosen not to intervene.

The plaintiff was given and signed forms before each of the first three procedures was begun, which he looked at and understood to be consent forms. The forms, dated March 18, March 20, and March 22, 1990, specified what procedures were to be done and stated that the signator is aware of the nature of the operation and has had all options, risks, and the possibility of complications explained.

Dr. John Murphy, a certified urologist and surgeon, as well as a Professor Emeritus at the School of Medicine of the University of Pennsylvania who has practiced for approximately fifty years, testified as plaintiff's expert. He found that plaintiff had a partial obstruction or blockage in the urinary tract. He agreed that obstruction can cause kidney damage or pre-dispose one to infection, and conceded that plaintiff had complications of severe angulation of the ureter, an enlarged middle lobe of the prostate, cysts in the kidneys, a high kidney, and a rib in the way of the kidney, which made access to the stone and removal of the stent difficult. He agreed with a passage from *"Campbell's Urology"* (*Campbell's*) that there is no bright line for when to intervene or not and that a physician must exercise judgment in considering the course of treatment and alternatives that exist.

Dr. Murphy testified that a person with plaintiff's condition "should be managed conservatively, that is, I would give the patient something for his pain—I would ask him to drink a lot of fluids. And I would send him home and watch him because he can pass these stones spontaneously." He offered evidence from *Campbell's*, which stated that a stone of less than four millimeters has a 90% percent chance to pass without intervention. The text stated that the managing of the patient with such a stone would include observation, fluids, and pain relief. Another textbook, D.R. Smith's *"General Urology"* stated:

Most ureteral stones are less than five millimeters in diameter and pass spontaneously. Expectant management consists of hydration and the liberal use of analge-

sics. Patients are instructed to strain all urine and to save the stone for analysis. Films of the abdomen and pelvis are obtained at one to two week intervals to monitor the progress of the stone down the ureter. If the patient develops fever associated with urinary tract infection, severe ureteral colic, which means pain, unresponsive to all medication, severe nausea and vomiting, complete obstruction of a solitary kidney or impaction of the stone, hospital admission and surgical or manipulative treatment are indicated.

Plaintiff's expert opined that, because of the small size of the stone, the plaintiff's lack of symptoms on admission, the fact that his kidney was only partially obstructed, his lack of fever, and the single incidence of vomiting, the patient should have been sent home, given some pain pills, and told to drink a lot of fluids and watch his urine for the stone to come out.

Murphy testified that every physician has a duty to inform his patient what his plans are and why. In this case, he said that defendant had a duty to inform plaintiff that, in all probability, the stone would pass on its own. Murphy asserted that the only course of treatment at that stage was to allow the stone to pass spontaneously.

Further, Murphy testified that defendant should have informed plaintiff that he planned on leaving a stent in his body. He stated plaintiff's enlarged prostate made it difficult to remove the stent and caused bleeding. He stated defendant also breached the standard of care by again attempting to remove the stent in the hospital in the same way, after failing in the office. Murphy also testified that plaintiff's current bleeding was a result of defendant's actions, and that plaintiff was predisposed to future problems and had permanent scar tissue in his urinary tract.

Defendant's expert, Stephen Cohen, M.D., a Bergen County Urologist and Chairman of the Department of Urology at Valley Hospital in Ridgewood, testified that the way defendant decided to go after the stone is the ordinary way most urologists would have approached the case, but that plaintiff's anatomy presented difficult problems. He testified that the indications for intervention were: 1) a stone for six to seven days; 2) a stone having problems getting down and not easily passed; 3) a week of renal colic; 4) a

position of the stone that was easily accessed and removed; 5) that once the procedures start they cannot stop; and 6) nausea and vomiting. He added that an unpassed and unremoved stone may cause infection which can cause sepsis or death. He did not believe there was a duty to advise of the stent beforehand because it was not foreseeable that it would migrate the way it did.

Cohen testified that it was not a breach of practice not to inform the patient that he had two options. The doctor has to make the decision and the patient has to agree to it. He was of the view that a patient does not have to be told of an option of no surgery if the doctor does not think it is an option. He based this on the idea that the patient is not a participant in making the doctor's judgment. He concluded that defendant's judgment was good and that he did the appropriate thing in not informing the patient about possibly observing the stone longer. He also refuted Campbell's statistics. He believed the 90% figure related to those cases that are not treated at all, but that more than 90% of the stones are not allowed to pass because they can be removed and the pain can be relieved by intervention.

Defendant testified he is a Board Certified urologist and has utilized the urethroscope since its inception six to seven years ago, having performed approximately twenty to thirty procedures with it each year since then. As to management of plaintiff's condition, he testified that plaintiff was observed for some thirty hours with urine straining and that no stones were retrieved. He stated that he booked an operating room in case it would be needed and that, prior to starting any of the procedures, he discussed the procedures with the plaintiff and did related drawings.

Defendant testified:

> When I practice medicine I try to recommend the thing I think is best for the patient at that time. And so I told him that this was in my estimation the best advice I could give him. I often tell people, you know, maybe the stone will pass and I did in his case because he was straining his urine. He knew we were looking for a stone to pass and he knew if a stone were to pass I would call a halt to the whole thing.

He stated that intervention was the only way to proceed to relieve the problem, and felt he had probably discussed the risks of stone persistence without removal, such as obstruction, bacteria, kidney infection, blood poisoning and death, because it is his normal practice to do so.

A motion for a directed verdict differs from that for summary judgment only in that the latter is based on documentary-evidential materials while the former is based on evidence presented at trial; thus, a directed verdict, like summary judgment, should be granted if the evidence " 'is so one-sided that one party must prevail as a matter of law.' " *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995) (citation omitted). On such a motion, all favorable inferences must be granted to the non-movant. *Ibid.*

On the proofs presented at trial, plaintiff was entitled to a directed verdict on the issue of defendant's failure to make adequate disclosure of available options prior to the initial procedure. Informed consent is essentially a negligence concept "predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies." *Largey v. Rothman*, 110 *N.J.* 204, 208, 540 *A.*2d 504 (1988). The doctrine is the primary means by which the law protects an individual's personal interest in one's body. *In re Conroy*, 98 *N.J.* 321, 346, 486 *A.*2d 1209 (1985). Under the principle of informed consent, " 'no medical procedure may be performed without a patient's consent, obtained after explanation of the nature of the treatment, substantial risks, and alternative therapies.' " *Id.* at 346, 486 *A.*2d 1209 (citation omitted).

To succeed on a charge of lack of informed consent, a plaintiff must establish 1) that the physician failed to comply with the applicable standard for disclosure, and 2) that such failure was

the proximate cause of plaintiff's injuries. *Largey, supra,* 110 *N.J.* at 215, 540 *A.*2d 504; *Grasser v. Kitzis,* 230 *N.J.Super.* 216, 221, 553 *A.*2d 346 (App.Div.1988); *Nicholl v. Reagan,* 208 *N.J.Super.* 644, 651, 506 *A.*2d 805 (App.Div.1986); *Skripek v. Bergamo,* 200 *N.J.Super.* 620, 633–34, 491 *A.*2d 1336 (App.Div.), *certif. den.* 102 *N.J.* 303, 508 *A.*2d 189 (1985).

The "prudent patient" standard, also known as the "materiality of risk" standard, is used to determine whether a physician has complied with the disclosure requirements. *Largey, supra,* 110 *N.J.* at 212–13, 540 *A.*2d 504. Under this standard, a physician must disclose all information material to a reasonably prudent patient's treatment decision. *Id.* at 211, 540 *A.*2d 504. The test of materiality is simply whether a reasonably prudent patient, "in what the physician knows or should know to be the patient's position, would be 'likely to attach significance to the risk or cluster of risks' in deciding whether to forego the proposed therapy or to submit to it." *Id.* at 211–12, 540 *A.*2d 504 (quoting *Canterbury v. Spence,* 464 *F.*2d. 772, 787 (D.C.Cir.), *cert. den.,* 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L. Ed.*2d. 518 (1972)). A physician who fails to disclose alternative treatments that a reasonably prudent patient, in what the physician knows or should know to be the patient's position, would consider significant in making one's own treatment decision violates the standard for disclosure. *Id.* An expert is required to establish proof of a risk, or existence of an alternative treatment, recognized by the medical community, but expert testimony is not required to establish the standard of disclosure. *Febus v. Barot,* 260 *N.J.Super.* 322, 327, 616 *A.*2d 933 (App.Div.1992).

In this case, even defendant's expert recognized that two options existed in regards to the treatment of the plaintiff as follows:

Q. Dr. Cohen, in your opinion, in your expert opinion, Dr. Antiles in this case had two choices, surgery or not surgery. Is that correct?

\* \* \* \* \* \* \* \*

A. Yes, he had those options when he saw the patient.

\* \* \* \* \* \* \* \*

Q. I'll ask you clean—I'll try to ask you direct questions. You told the jury today that there were two—in your expert opinion, there were two ways to approach this, either observe it—

A. Right.

Q. —or surgically remove it. Is that correct?

A. That's correct.

Q. And you also—in response to my next question you told the jury, "Well, that decision as to which branch to take is a decision between the doctor and patient." Is that correct?

A. The doctor has to make the decision and the patient has to agree with it.

The defense expert also testified that observation was an acceptable alternative and that it would not have been a deviation from acceptable practice to utilize this approach. As to the duty to disclose, he stated that the decision was the treating doctor's based on a subjective or medical judgment basis, as follows:

Q. Does the patient have to be told, in your mind, that he has an option of no surgery?

A. Not if the doctor doesn't think that no surgery is an option. The doctor has to make a choice between surgery and no surgery, and once he makes the choice and tells the patient what he feels should be done and if the patient agrees with him, then the other option doesn't exist.

■ We conclude there was no dispute that observation existed as a reasonably available medical alternative of which plaintiff had to be advised. Whether the doctor had the duty to disclose such an alternative is a legal question—neither the treating doctor nor the medical profession is the final arbiter. The defense expert's opinion that it was the physician's job to make the decision and present the best alternative is in direct conflict with the holding in *Largey*, which states that " 'it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie.' " *Largey, supra,* 110 *N.J.* at 214, 540 *A.*2d 504 (citation omitted). The defense expert's remarks are characteristic of those arguments advanced in support of the "professional" standard that the Court rejected in *Largey* because they "smack of an anachronistic paternalism that is at odds with any strong conception of a patient's right of self determination." *Ibid.*

Plaintiff's expert testified that observation was the appropriate method of treatment and that the plaintiff should have been

observed longer, given something for his pain, asked to drink a lot of fluids, and watched to see if the stone passed spontaneously. Two medical textbooks were also offered to demonstrate that observation was a viable alternative for the plaintiff. That a reasonably prudent patient would have attached significance to information regarding an observation alternative is beyond dispute. A patient with no fever, only partial obstruction of one kidney, intermittent pain, and who vomited only once without question would desire to be informed not only of the option of surgery, but also of the much less intrusive alternative that would involve pain medication, fluids, and observation in anticipation of the natural passing of the stone.

The surgical procedure employed here was not so simple or common place that a reasonably prudent patient can be said, in any instance besides an emergency, not to attach significance to information that allowed for the natural passing of the stone. No emergent situation was encountered and plaintiff was not in danger of losing his life or suffering serious bodily injury in the absence of immediate surgery. The defense expert's testimony that sepsis or death were risks associated with stones made it clear that such risks were remote, and that the plaintiff, in fact, did not have any fever or infection that could cause such harm.

Plaintiff was not informed that observation was an alternative to surgery. Defendant conceded that fact in the following trial testimony:

[Defense Attorney]: Why did you not give Peter Caputa a choice to do observation?

[Defendant]: I gave him the idea that the best treatment that I could recommend for him was what I was recommending. I like to do the best medicine that I can do under the circumstances. That was the best thing in my judgment that I should do for him.

[Defense Attorney]: Was there anything else that you could do that you communicated to him?

[Defendant]: I think I may have in passing hinted on the fact, but I excluded it because I think it was not as good an option.

[Defense Attorney]: Okay. So you would have ruled out observations?

[Defendant]: Yes.

Defendant further stated on cross-examination:

[Plaintiff's Attorney]: Did you tell him, did you tell him that if the stone is four millimeters or less, 90 percent of the time it passes spontaneously, so I'm going to send you home and observe you, did you tell him that?

[Defendant]: Absolutely not.

[Plaintiff's Attorney]: You didn't tell him that because you believed that he had no options except surgery, isn't that correct?

[Defendant]: That's correct.

■ The doctor's testimony that plaintiff "knew we were looking for a stone to pass and he knew if a stone were to pass I would call a halt to the whole thing" did not adequately disclose the alternative of continued observation without surgery. Clearly, the defendant excluded observation from the treatment alternatives offered to plaintiff because he thought it was not as good an option. Replete throughout defendant's testimony is the theme that he made a judgment that surgery was the best option for the plaintiff and, therefore, surgery was the only option that he informed plaintiff about. That the doctor "may have in passing hinted on the fact" that observation existed as an alternative does not, as a matter of law, " 'impart information [that] the patient has every right to expect,' as well as [fulfill the doctor's] duty of 'reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved.' " *Largey, supra,* 110 *N.J.* at 211, 540 *A.*2d 504 (quoting *Canterbury v. Spence, supra,* 464 *F.*2d at 782). Thus, the jury should have been instructed, that as to the initial procedure, plaintiff had established that defendant failed to offer the alternative treatment of observation without intervention and thereby breached his duty to obtain plaintiff's informed consent.

■ Having proved that the defendant breached his duty to disclose alternate treatments, the plaintiff must next show causation by establishing that a " 'prudent person in the patient's position would have decided differently if adequately informed.' " *Largey, supra,* 110 *N.J.* at 215, 540 *A.*2d 504 (citation omitted). "[I]f plaintiff would have consented to the procedure had she [or

he] been informed of the risks and alternatives, logic and funda-
mental justice dictate that the defendant should not be held liable
for the injuries sustained as a result of the performance of the
procedure even though [the doctor] failed to inform plaintiff of
such risks and alternatives." *Skripek, supra,* 200 *N.J.Super.* at
634, 491 *A.*2d 1336. "Proximate cause in a lack of informed
consent action is resolved by application of an objective standard:
in terms of what a prudent person would have done if suitably
informed, not by the patient's hindsight testimony that he or she
would have subjected himself or herself to the course of treatment
if the warnings had been given". *Nicholl, supra,* 208 *N.J.Super.*
at 651, 506 *A.*2d 805

At oral argument, plaintiff conceded that the proximate
cause issue must go to a jury because reasonable minds could
differ as to whether a reasonably prudent person in plaintiff's
position would have gone through with the surgery even if in-
formed that continued observation was a viable alternative. While
the plaintiff testified that he would have chosen observation
because the pain was still intermittent, there was testimony
tending to show that a reasonable patient would have expected an
uneventful surgery, that surgery might have been appropriate,
and that plaintiff's pain was such that he wanted it to end.
Because the test for proximate cause is an objective one, the jury
must determine whether a reasonably prudent patient in the
plaintiff's condition would have gone through with the surgery
after having been properly informed of the available option.

We need not consider plaintiff's contention that the arguments
of defense counsel were so damaging that the jury was not able to
properly discharge its duty on the issue of informed consent. The
situation will not arise at retrial as we have removed it from jury
consideration. Plaintiff's remaining contentions of trial error are
similarly mooted.

Regarding the trial judge's refusal to grant a new trial, it
is axiomatic that such a ruling "shall not be reversed unless it
clearly appears that there was a miscarriage of justice under the

law." *R.* 2:10–1. To determine if a miscarriage of justice occurred, an appellate court defers to the trial court in regards to the "intangibles" of the case, including credibility, demeanor, and the general feel of the case, but otherwise makes its own independent determination of whether a miscarriage of justice occurred. *Carrino v. Novotny,* 78 *N.J.* 355, 360, 396 *A.*2d 561 (1979); *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 597–98, 379 *A.*2d 225 (1977); *Dolson v. Anastasia,* 55 *N.J.* 2, 6–8, 258 *A.*2d 706 (1969).

Defendant's expert testified that defendant's diagnosis and treatment were appropriate. The jury had a right to accept the defense testimony over that of plaintiff and his expert. We find no basis to disturb the jury determination that defendant was not negligent in his care and treatment of plaintiff.

In summary, we hold that the trial judge shall instruct the jury on retrial that plaintiff has established that the defendant failed to disclose all of the information that a reasonable person in plaintiff's position would expect a doctor to disclose prior to proceeding with the March 19, 1990 surgery. The jury shall then decide whether defendant's failure to comply with that standard was a proximate cause of plaintiff's injury. Further, it will be for plaintiff to decide whether there is benefit to establishing, through separate interrogatories, independent failures to obtain informed consent as to the second or third procedures. Plaintiff may be content to argue that those surgeries were directly occasioned by the initial breach and, therefore, are necessarily causally connected despite the absence of any subsequent negligence. We take no position on those issues.

Affirmed in part; reversed and remanded in part.