890 A.2d 983 (2006)
383 N.J. Super. 76
Richard SAKS and Norma Saks, his wife, Plaintiffs-Appellants,
v.
Elena M. NG, M.D., individually and as agent, servant and employee of defendants, Millennium Eye Care, LLC, and Eye Physicians and Surgeons, P.A., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 17, 2006.
Decided February 8, 2006.
*986 John M. Blume, Chatham, argued the cause for appellants (Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte, attorneys; Cynthia M. Craig, on the brief).
Michael J. Keating, Cranford, argued the cause for respondents Elena M. Ng, M.D. and Millennium Eye Care, LLC (Dughi & Hewit, attorneys; Gary L. Riveles, on the brief).
Before Judges PARKER, C.S. FISHER and YANNOTTI.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Plaintiffs Richard Saks (Saks) and Norma Saks filed a complaint against defendants Elena M. Ng, M.D. (Ng), Millennium Eye Care LLC and Eye Physicians and Surgeons, P.A. arising from an operation performed by Ng on April 2, 2001 to repair a detached retina in Saks' right eye. In the complaint, Saks alleged that Ng performed the operation negligently and failed to obtain his informed consent for the procedure. Saks' wife Norma asserted a claim for loss of her husband's services, society and consortium. Following a trial, the jury returned a verdict of no cause for action. Judgment was entered for defendants and this appeal followed. We affirm.

I.
We briefly summarize the relevant facts based on the evidence presented at trial. In 1976, Saks became a patient of Eye Physicians and Surgeons, an entity which later changed its name to Millennium Eye Care. Saks had his eyes examined and his corrective lenses updated on a periodic basis. In 1996, when he was at a health club, Saks was struck in the left eye by another patron. Saks presented to Millennium and was referred to Ng, who determined that Saks had a traumatic inflammation of the iris and a partial retinal tear in his left eye. Ng also found that Saks had a pinpoint retinal hole in his right eye. The doctor performed laser photocoagulation surgery to repair the retinal tear in the left eye. Saks made follow-up visits to Ng at various times in subsequent years.
On March 29, 2001, Saks accompanied his wife to a professional conference in Toronto, Canada. After checking into the hotel, Saks experienced problems with the vision in his right eye. He saw flashes and stars. The hotel staff referred Saks to a local ophthalmologist, who instructed Saks to go immediately to a hospital. There, Saks was diagnosed with a retinal tear in his right eye and transferred to a second hospital. The ophthalmologist there consulted with Ng by phone and temporarily repaired the tear with laser surgery. Saks made an appointment with Ng and returned to New Jersey.
Saks saw Ng on March 31, 2001. She examined Saks and determined that he had a retinal detachment in his right eye. Ng recommended scleral buckle surgery. Ng testified that some of these procedures are relatively simple and some more complicated. She said that if a patient has a small retinal detachment, it can be repaired by sewing into place a "silicone sponge," which she described as a band of clear silicone material. She explained that *987 the sponge pushes the eyeball in and, "the more the eyeball is pushed in it seals up the retina."
However, Ng said that a large retinal tear is a "more complicated problem." Patients with such a condition may have accumulated fluid between the retina and the back of the eye. They also may have a history of retinal holes which makes the retina more vulnerable to further tearing in the future. For those patients, more is required than placing a small piece of "silicone sponge" in one section of the eye.
Ng asserted that the fluid causing the tear first must be drained. To do so, the doctor makes a small incision in the wall of the eyeball until the vascular part of the eye is exposed. When the fluid is drained, the retina returns to its normal position. Because the retina still has the potential of detaching again, the doctor sews a scleral buckle over the area of the tear, pushing the wall of the eyeball and sealing up the tear.
If the patient's retina is still vulnerable, the doctor inserts an encircling band. To do so, the eyeball is rotated exposing one section of the eye at a time. Sutures then are placed all around the eyeball. Ng explained:
And at the end you pull up on this band a little bit, okay, and the band and the sutures will act like a belt holding up the pants and squeezing in the waist a little bit. Okay?
And once the eyeball, the wall of the eyeball all the way around is squeezed in it will support the retina, it will cut down on the chances of retinal tears forming and retinal detachment forming in the future.
Saks' procedure involved the insertion of the encircling band with the multiple sutures.
Ng used retrobulbar anesthesia for the surgery. She explained how this form of anesthesia is administered. The patient is given general anesthesia so the patient will not experience pain when the retrobulbar needle is inserted. The doctor then feels the bone structure around the eye and slides the needle over the bone, under the eye, aiming the needle at the rear of the eye called the muscle cone. Ng said she can feel the needle passing through soft tissue. She testified:
Gently and slowly we  it's how you feel with the tip of your fingers and your experience. That's what counts. That's how you know how far to go.
And once we know that we've passed the eyeball we would angle it slightly fifteen degrees up and go a little bit further and when you hit the muscle cone you feel a slight pop just at the  you don't hear anything. You can just feel it at the tip of your finger and from experience.
You know you're there, you draw back, make sure you don't get blood in the syringe, okay[.] [W]e maneuver the tip of the needle a little bit just to make sure that the tip of the needle didn't catch the eyeball and then we slowly inject the anesthetic and then we slowly withdraw the needle.
Saks testified that he had no pain in the recovery room. Saks said that his right eye was completely covered with a shield and a bandage. He returned the following morning, and when the bandage was removed, Saks realized he had no vision in his right eye. Ng examined the eye and found that there was hemorrhaging on the retina. Ng referred Saks to a retinal specialist, Dr. William Tasman, who sent Saks to Wills Eye Hospital in Philadelphia, where he came under the care of Dr. Peter J. Savino, a neuro-ophthalmologist. Saks remained in the hospital four or five *988 days and when he was released, he still had no vision in his right eye. It is undisputed that the condition is permanent.
Saks presented testimony from Scott Soloway, M.D. (Soloway), who was qualified as an expert in ophthalmology and the administration of anesthesia by ophthalmologists. Soloway testified that two types of anesthesia are used when performing the scleral buckling procedure: peribulbar and retrobulbar anesthesia. The former is administered by injections through the eyelids whereas the latter is administered by an injection through the cone of the muscle in the retro-orbital space. Soloway stated that peribulbar anesthesia presents less of a risk of injury to the optic nerve, which can cause blindness.
Soloway opined that Ng deviated from the accepted standard of care for the proper administration of retrobulbar anesthesia by penetrating the optic nerve with the retrobulbar needle. Soloway explained that the anesthesia is administered with a blunted needle that is about an inch and one-half long. According to Soloway, in this case, the needle penetrated too deeply and went into the optic nerve. The needle caused changes in the back of the eye, affected the nerves and essentially destroyed the retina.
Soloway was asked to explain the basis for his assertion that Saks' optic nerve was injured when the anesthesia was administered. He responded by pointing to Ng's deposition testimony, in which she had stated that the optic nerve had been injured in the procedure. Soloway also pointed to the discharge summary from Wills Eye Hospital, which stated that there was a "presumptive" optic nerve injury. In addition, a report of an MRI performed on April 3, 2001 stated that there was an enlargement and enhancement of the orbital portion of the right optic nerve, with enhancement of the optic nerve sheath as well. This, in Soloway's view, was consistent with trauma to the optic nerve  "fluid getting into the optic nerve and damage to the optic nerve."
Soloway also was asked whether the loss of vision in Saks' right eye was caused by a central retinal vein occlusion. Such an occlusion involves a blockage of the central retinal vein. When this occurs, blood entering through the artery cannot drain out of the eye. With no place to go, the blood leaks into the retinal tissue causing hemorrhaging and a loss of vision. Soloway said that the loss of vision in this case was caused by the injection into the optic nerve which caused a central retinal vein occlusion. Soloway was asked whether there would have been a central retinal vein occlusion in Saks' eye if the needle had not gone into the optic nerve and his reply was, "No."
Soloway also testified that Ng failed to inform Saks of any of the risks that accompany the use of retrobulbar anesthesia. Ng elected to use retrobulbar rather than peribulbar anesthesia. According to Soloway, Ng failed to give Saks a choice as to which kind of anesthesia he would receive.
On cross-examination, Soloway stated that he had no criticism of Ng's decision to use retrobulbar anesthesia. He conceded that the choice of the type of anesthesia is a matter of medical judgment. Soloway also had no criticism of the manner in which Ng performed the scleral buckling procedure. Soloway agreed that injury to the optic nerve was a rare but recognized complication of retrobulbar anesthesia. He also conceded that Tasman did not state in his chart that the anesthesia needle hit the optic nerve. Rather, Tasman wrote that the patient's findings had the "appearance" of a central retinal vein occlusion.
*989 Ng testified that peribulbar anesthesia was not appropriate for Saks' surgery. She stated that the procedure is "very delicate." The patient must achieve "total akinesia," that is, no movement in the eye muscle. If the patient moves during the surgery, bleeding can occur and, in these circumstances, there is a potential for loss of vision. Ng said that she has been practicing for sixteen years and she has never used peribulbar anesthesia for the scleral buckling procedure, with the encircling band. Ng asserted that she did not offer Saks peribulbar anesthesia because it was not indicated "in light of the nature of the complexity of his retinal detachment."
Ng additionally testified that she had no specific recollection of what she told Saks about retrobulbar anesthesia. She testified as to the information she generally conveys to patients regarding the anesthesia when she performs scleral buckling surgery:
I tell them that the scleral buckling procedure of this type done under, you know, local anesthesia and the  I usually tell them that then there's a needle administered right here, and I will show it to them with my finger, right here under the eyeball, but you will be put to sleep. Because at that point when you mention needle in the eye they're turning pale, they're ready to pass out already. Okay.
So I assure them it will be a painless procedure because a board certified anesthesiologist will give you something in your vein, knock you out for five minutes, you'll be sleeping and I will stick a needle under the eye aiming to the back, injecting novocaine, the kind of anesthestic that dentists use like novocaine, to numb the eye. Okay?
And the needle being  going back to the eye can hit the eye or the bone structures in the back of the eye. That can happen, but it's very, very rare. Okay?
Ng also testified that after the procedure, she used a thalmoscope to examine the retina in Saks' right eye. She asserted that the central retinal artery was profusing, which indicated that the pressure in the eye was adequate. Ng added that, one of the complications of the procedure is that the eye can hemorrhage internally. She stated, "And so at the end of the case if I look into the back of the eye with my special instrument . . . and I don't see any blood that tells me that [the patient] didn't have that complication."
Ng added that, when Saks returned the day after the surgery to have the bandage removed, she was "shocked" that he could not "get a vision" in his right eye. She made a working diagnosis of a central retinal vein occlusion or ischemic optic neuropathy, which is poor blood supply and oxygenation to the optic nerve, causing the nerve to become swollen. Ng was asked if, before Saks was referred to Tansman and Savino, she knew with certainty what caused the loss of vision and she replied that she did not.
However, in her deposition, Ng had been asked whether the loss of vision was caused by the anesthesia needle coming in contact with the optic nerve and she replied, "Yes." Moreover, Saks propounded an interrogatory which asked Ng to state the cause of the loss of vision in Saks' right eye. Her response to this question was, "To a reasonable degree of medical probability that [Saks'] vision loss was caused by an optic nerve injury which occurred at or around the time of surgery."
Ng presented testimony from Ezra S. Kazan, M.D. (Kazan), who was qualified as an expert in the field of ophthalmology. Kazan testified that Saks' surgical procedure could not have been performed under peribulbar anesthesia. Kazan stated that *990 Ng treated Saks appropriately. Saks required the scleral buckle procedure. Kazan opined that Ng performed the surgery appropriately. He was asked whether a central retinal vein occlusion could occur as a complication of a retrobulbar injection. Kazan replied, "Anything is possible." He added:
[B]ut if it did occur and if it was due from the needle, you would have seen it before the patient left the operating room, and the eye was examined by Dr. Ng. The central retinal artery was pulsating. There was no evidence at all of central retinal vein obstruction because central [retinal] vein obstruction is  there was no confusion with any type of other diagnosis.
The retina was perfectly flat. I believe her operative report says that the retina was in place and the buckle was in place. So, in theory anything [is] possible, but in this particular case, it cannot happen or did not happen because there was no evidence at all that there was any damage to the retina.
The macula was good and the central retinal artery was pulsating very nicely, and if that is what you see, it means that everything is fine. That's the end of the case. There is nothing to do, and no complications.
Kazan was asked to state his opinion as to the "mechanism of the vision loss in this case." He said that Saks had a central retinal vein obstruction in his eye. According to Kazan, this occurred between the time Saks left the operating room table and the following morning. Kazan stated that he knew the obstruction was not there when the surgery was completed because there was no bleeding and the central retinal artery was pulsating, "which means it was supplying nutrients to the eye as it should be."
Kazan also stated that if there had been a penetration of the optic nerve when the anesthesia was administered, the obstruction "would have happened immediately." Kazan said that an obstruction would have been seen before the surgery. Kazan opined that "nothing happened" during the surgery because "the color of the retina, the profusion of the central retinal artery and the position of the [retina] in the sclera buckle tells you that everything went fine. . . ."
Kazan additionally testified that the MRI taken after the procedure did not show any injury to the optic nerve. The MRI did not "show that there was massive swelling or collection of blood" in the optic nerve or the optic sheath. Kazan stated:
The significance of that is very important. If you did penetrate the nerve with the needle and you did inject the anesthetic fluid, you're going to find fluid within that nerve and within the sheath, and you will also find bleeding, a hematoma within that nerve and sheath.
Kazan asserted that the central retinal vein obstruction was an "untoward reaction to the surgery." It was a stroke and a "stroke can happen at any time." There was a temporal relationship between the surgery and the obstruction but, according to Kazan, the obstruction could have occurred at any time.

II.
Plaintiffs first argue that the trial judge erred in refusing to give the jury a conditional res ipsa loquitur charge. We disagree.
In general, negligence is never presumed and the burden of proving negligence rests with the plaintiff. Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981) (citing Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 139, 84 A.2d 281 (1951)). However, the doctrine of res ipsa *991 loquitur permits a jury to infer that the defendant was negligent if: 1) the occurrence itself ordinarily bespeaks negligence; 2) the instrumentality causing the harm was in the exclusive control of the defendant; and 3) the circumstances do not indicate that plaintiff's own act or neglect caused the injury. Ibid. (citing Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 269, 139 A.2d 404 (1958)).
The res ipsa loquitur doctrine is applicable in medical malpractice actions. Ibid. The doctrine may be applied where, as a matter of common knowledge, an event would not have occurred if defendant had not deviated from the applicable standard of care. Id. at 527, 435 A.2d 1150. In those circumstances, the plaintiff is relieved of the burden of producing expert testimony to establish such a deviation. Ibid. The doctrine may also be applied if there is expert testimony "to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence. . . ." Ibid. The evidence must show that the "probable existence of negligence is at least as probative of the existence of such a probability as the `common knowledge' of lay persons." Ibid.
We considered the application of res ipsa loquitur in Roper v. Blumenfeld, 309 N.J.Super. 219, 706 A.2d 1151 (App.Div.), certif. denied, 156 N.J. 379, 718 A.2d 1208 (1998). In that case, plaintiff broke off a portion of a molar when biting down on a piece of candy. Id. at 223, 706 A.2d 1151. Plaintiff presented to defendant, who diagnosed an inflammation of a dying nerve in the tooth, and gave plaintiff the option of a root canal or tooth extraction. Plaintiff agreed to have the tooth removed. Ibid. While defendant was performing that procedure, the crown and part of the tooth fractured below the gum, leaving the root of the tooth embedded in the bone. Id. at 224, 706 A.2d 1151. Because removal of the root required a procedure that was beyond his expertise, defendant referred plaintiff to an oral surgeon, who performed the procedure the following day. Plaintiff alleged that, following the initial attempt to remove the tooth, she began to experience numbness in her lip and chin. Ibid.
Based in part on the immediate onset of numbness following defendant's attempt to remove the tooth, plaintiff's expert opined that defendant deviated from an accepted standard of care because extraction of the tooth should not have caused permanent injury to the nerve. Id. at 226, 706 A.2d 1151. Defendant's expert disputed this testimony, asserted that defendant did not deviate from the standard of care, and the presence of numbness did not indicate that defendant was negligent in the performance of the procedure. Id. at 227, 706 A.2d 1151. Defendant's expert testified that numbness could occur even in the absence of negligence and plaintiff's condition was an inherent risk of a tooth extraction. Ibid.
We held in Roper that the plaintiff had presented sufficient evidence to establish all three of the prongs required for application of res ipsa loquitur. Id. at 232, 706 A.2d 1151. We recognized that the defendant "hotly disputed" plaintiff's claim that the numbness began immediately after defendant's treatment, and plaintiff's assertion that a nerve injury is not an expected risk of a tooth extraction. Ibid. However, we stated that when the evidence presents a factual dispute as to how an accident occurred and the res ipsa doctrine only applies to one version of the event, "the court should give a `conditional' res ipsa loquitur instruction, under which the jury is directed first to decide how the accident happened and to consider res ipsa loquitur only if it finds that the accident occurred in the manner which fits the doctrine." *992 Ibid. (quoting from Allendorf v. Kaiserman Enters., 266 N.J.Super. 662, 669, 630 A.2d 402 (App.Div.1993)).
We are convinced that a "conditional" res ipsa loquitur charge was not required in this case. Unlike the plaintiff in Roper, plaintiffs in this matter did not present evidence to establish all three factors required for the application of the doctrine. Ibid. Here, plaintiffs failed to establish that the occurrence itself "ordinarily bespeaks negligence." Buckelew, supra, 87 N.J. at 525, 435 A.2d 1150. Soloway opined that Saks' loss of vision occurred because Ng inserted the anesthesia needle into the optic nerve, which in turn caused the central retinal vein occlusion. Soloway further opined that, if the needle had not penetrated the optic nerve, there would not have been a central retinal vein occlusion. Soloway testified that Ng was negligent and her negligence caused the injury.
However, Soloway did not say that a central retinal vein occlusion of the sort evidenced here "ordinarily bespeaks negligence." Ibid. Moreover, Soloway did not state that the medical community recognizes that a central retinal vein occlusion does not ordinarily occur in the absence of negligence. Ibid. Clearly, Soloway did not establish the foundation for the res ipsa charge as required by Buckelew. Therefore, we are convinced that the judge correctly ruled that a res ipsa loquitur charge was not warranted in this case.

III.
We next consider plaintiffs' contention that the judge's instruction on informed consent was erroneous.
"Informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to" consider and weigh knowledgeably the options available and the risk attendant to each. Perna v. Pirozzi, 92 N.J. 446, 459, 457 A.2d 431 (1983). "To assure that the patient's consent is informed, the physician should describe, among other things, the material risks inherent in a procedure or course of treatment." Matthies v. Mastromonaco, 160 N.J. 26, 37, 733 A.2d 456 (1999)(citing Largey v. Rothman, 110 N.J. 204, 210-13, 540 A.2d 504 (1988)).
The physician must disclose only the information that is material to a reasonable patient's informed decision. Id. at 36, 733 A.2d 456 (citing Largey, supra, 110 N.J. at 211-12, 540 A.2d 504). "The test for measuring the materiality of a risk is whether a reasonable patient in patient's position would have considered the risk material." Id. at 37, 733 A.2d 456 (citing Largey, supra, 110 N.J. at 211-12, 540 A.2d 504). Moreover, for a patient's consent to be informed, the physician must discuss with the patient medically reasonable alternatives that the physician does not recommend. Id. at 38, 733 A.2d 456. "Otherwise, the physician, by not discussing these alternatives, effectively makes the choice for the patient." Ibid.
The judge in this case based his instructions on Model Jury Charge (Civil), 5.36(C), "Informed Consent (Competent Adult And No Emergency)," (March 2002). The judge first explained the general principles applicable to the informed consent claim. He then stated:
The plaintiff must prove all the following elements. The defendant doctor failed to give the plaintiff all the information that a reasonable person in the plaintiff's position would expect a doctor to disclose regarding anesthesia and the delivery methods, so that the plaintiff might make an informed decision about the course of treatment.

*993 And, two, the undisclosed risks of the surgery and/or the means of anesthesia occurred.
And, three, a reasonable person under. . . the circumstances of this case would not have consented to the type of delivery of the anesthesia, or not have chosen to undergo the treatment or operation had they been so informed.
And, four, the course of treatment or operation or negligent delivery of the anesthesia was a proximate cause of producing plaintiff's injuries or conditions.
Plaintiffs argue that the judge should have directed a verdict on the first element of the claim. We disagree.
When a motion for partial judgment is made pursuant to R. 4:40-1 at the close of all of the evidence, the judge applies the same standard as is applied to a motion for involuntary dismissal under R. 4:37-2(b). Frugis v. Bracigliano, 177 N.J. 250, 269-70, 827 A.2d 1040 (2003) (citing Luczak v. Township of Evesham, 311 N.J.Super. 103, 108, 709 A.2d 305 (App.Div.), certif. denied, 156 N.J. 407, 719 A.2d 639 (1998)). The judge must accept as true all of the evidence supporting the contentions of the party opposing the motion, and give that party the benefit of all legitimate inferences which can be reasonably drawn from the evidence. Ibid. The motion should be granted only if the evidence on the fact issue is so "one-sided" that the moving party should prevail as a matter of law. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995)(quoting from Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).
Plaintiffs assert that Ng conceded in her testimony that she did not explain to Saks that there was an alternative to retrobulbar anesthesia. However, Ng testified that retrobulbar anesthesia was the only medically appropriate form of anesthesia for Saks' operation. Her expert Kazan agreed. Although plaintiffs presented testimony which supported their theory that peribulbar anesthesia was a medically reasonable alternative, that was an issue for the jury.
Plaintiffs also assert they were entitled to a directed verdict because Ng did not disclose the risk of optic nerve injury. However, defendants presented evidence which supported their contention that the risk of optic nerve injury is relatively small. The law only requires the disclosure of material risks. Matthies, supra, 160 N.J. at 36-37, 733 A.2d 456. There was sufficient evidence from which a jury could find that Ng disclosed all of the material risks concerning retrobulbar anesthesia. Accordingly, the judge properly refused to direct a verdict in favor of plaintiffs on this issue.
Plaintiffs additionally argue that the judge should have directed a verdict on the second element of the claim, specifically that the "undisclosed risk" of the anesthesia occurred. Plaintiffs claim that the "undisclosed risk" was an optic nerve injury resulting in a loss of vision. However, there was conflicting testimony on whether Saks' injury was the result of the penetration of the optic nerve with the anesthesia needle (as Soloway asserted) or a stroke (as Kazan testified). In light of this evidence, it would have been patently inappropriate for the judge to take this issue away from the jury.
Plaintiffs' reliance upon our decision in Caputa v. Antiles, 296 N.J.Super. 123, 686 A.2d 356 (App.Div.1996), is misplaced. In that case, the plaintiff sought treatment for a kidney stone. Id. at 127, 686 A.2d 356.
*994 The defendant performed several surgical procedures to remove the stone but failed to disclose to the patient that he had the option to consume large amounts of fluids and wait to see if the stone passed without surgical intervention. Id. at 130, 686 A.2d 356. We noted that the experts for both plaintiff and defendant acknowledged that fluid consumption and observation was a reasonable medical alternative to surgery. Id. at 135, 686 A.2d 356. We concluded that, based on this evidence, the plaintiff was entitled to a directed verdict on the issue of defendant's failure to make adequate disclose of available options before performing the initial surgery. Id. at 137, 686 A.2d 356.
Caputa is clearly distinguishable on its facts. Here, the experts did not agree that peribulbar anesthesia was a reasonable medical alternative to retrobulbar anesthesia. The jury was required to determine, based on their consideration of the testimony of Soloway, Ng and Kazan, whether peribulbar anesthesthia was appropriate for Saks' procedure. As we pointed out previously, disclosure is required only of alternatives that are medically reasonable under the circumstances. Matthies, supra, 160 N.J. at 38, 733 A.2d 456. Therefore, plaintiffs were not entitled to a directed verdict on the issue of Ng's alleged failure to adequately disclose alternative treatment options.

IV.
Plaintiffs next argue that the judge erred in instructing the jury on medical judgment. The judge employed Model Jury Charge (Civil), 5.36(G), "Medical Judgment," (March 2002), and instructed the jury as follows:
A doctor may have to exercise judgment when diagnosing and treating a patient. However . . . alternative diagnosis and treatment choices must be in accordance with accepted standard medical practice. Therefore, your focus should be on whether standard medical practice allowed judgment to be exercised as to diagnosis and treatment alternatives. And, if so, whether what the doctor actually did to diagnose to treat this patient was accepted as standard medical practice.
If you determine that the standard of care for treatment or diagnosis with respect to ophthamology, retinal surgery and/or administering by either retrobulbar or peribulbar procedure, did not allow for choices or judgment, . . . which the defendant doctor made here, then the doctor would be negligent.
Plaintiffs assert that the judgment charge should not have been given because Ng allegedly did not consider and weigh the alternatives between retrobulbar and peribulbar anesthesia. Again, we disagree. The "exercise of medical judgment" charge is appropriately applied when a physician selects "one of two or more generally accepted courses of treatment." Velazquez v. Portadin, 163 N.J. 677, 687, 751 A.2d 102 (2000) (citing Aiello v. Muhlenberg Reg'l Med. Ctr., 159 N.J. 618, 628-29, 733 A.2d 433 (1999)). Here, Ng testified that because Saks' procedure was long and complicated, he was not an appropriate candidate for peribulbar anesthesia. Kazan agreed the retrobublar anesthesia was an inappropriate form of anesthesia for Saks' surgery. Soloway admitted that the choice of anesthesia is a matter of medical judgment. In view of this evidence, Ng clearly was entitled to the judgment charge.
Plaintiffs additionally argue that the judge erred because the judgment charge was not properly tailored. When giving the medical judgment charge, the judge is required to "separate out those *995 aspects of the medical care that involved judgment and those that did not." Velazquez, supra, 163 N.J. at 688, 751 A.2d 102 (citing Patton v. Amblo, 314 N.J.Super. 1, 8-9, 713 A.2d 1051 (App.Div.1998)).
The record makes plain that the issue of medical judgment in this case is related to Ng's choice of anesthesia. The judge instructed the jury to focus on whether "standard medical practice allowed judgment to be exercised as to diagnosis and treatment alternatives." The judge referred to "ophthalmology, retinal surgery and/or administering by either retrobulbar or peribulbar procedure." The jury was not told that the medical judgment charge was inapplicable to the placement of the anesthesia needle but there was no evidence that insertion of the needle in the optic nerve was an appropriate medical choice. We are convinced that, when viewed in its entirety, and considered in light of the totality of evidence presented at trial, the medical judgment charge was properly focused on the choice between the peribulbar and retrobulbar anesthesia. In the particular circumstances of this case, the jury could not have been confused or misled into believing that the judgment charge applied to something other than the choice of anesthesia. We therefore are satisfied that the charge was properly tailored to the evidence in this case.

V.
We turn to plaintiffs' assertion that the judge erred in failing to instruct the jury that statements read into the record from certain medical texts could be considered as evidence. Plaintiffs requested the following instruction:
During the course of this trial the parties have used certain medical texts and articles to support their positions. Excerpts from those writings have been read to you. Those writings may be considered by you as evidence in this case and you may consider them in making your determination as to the cause of plaintiff's injury.
The judge instructed the jury concerning the testimony of the experts. The judge stated that the jury must resolve any conflicts in the testimony of the experts and give the testimony whatever weight the jury deemed appropriate. The judge added:
And also, you may recall that statements were read in conjunction with the examination of the witness. These statements were contained in publications and things of that nature.
However, merely because a publication has been read to you does not mean that you must accept it as binding on any of your decisions. You may give those statements discussed in the publication whatever weight you believe they deserve using your reason, judgment and common sense.
The charge essentially tracked the model jury instructions. See Model Jury Charge (Civil), 1.15, "Expert Testimony," (April 1995).
We are not convinced that the judge erred in using the model charge. The model charge does not explicitly inform the jury that the statements in the publications are evidence. However, that is implicit in the instruction. Furthermore, the jury in this case was instructed that the testimony of the witnesses was evidence. The witnesses read from and were questioned about statements in the medical texts. Those statements were part of the witnesses' testimony. We are satisfied that the jury could not have been misled into believing that the statements in the medical texts were anything other than evidence.

*996 VI.
Plaintiffs additionally argue that the judge erred by failing to instruct the jurors concerning the difference between the burden of proof in a civil case and the burden of proof in a criminal case. Here, the judge properly instructed the jury that the plaintiffs had the burden of proof and they were required to establish the elements of their claims by a preponderance of the evidence. See Botta v. Brunner, 26 N.J. 82, 90, 138 A.2d 713 (1958)(noting that it is "elementary" that plaintiff in a negligence action must prove claim by a preponderance of the evidence). Drawing upon Model Jury Charge (Civil), 1.12(H), "General Provisions and Outline for Standard Charge," (Nov. 1998), the judge explained:
To sustain the burden, the evidence supporting the claim must weigh heavier and be more persuasive in your mind that the contrary evidence. It makes no difference if the heavier weight is small in amount, as long as the evidence supporting the claim weighs heavier in your minds, then the burden of proof has been satisfied and the party who has the burden is entitled to your favorable decision on that claim.
We are not convinced that the judge was required to distinguish this burden of proof from the burden of proof in a criminal case. Plaintiffs' assertion that the jurors might have been confused because they may watch television programs or movies about criminal cases is entirely without merit. We are satisfied that the instructions were legally correct and unlikely to confuse or mislead the jury.

VII.
Plaintiffs next contend that question # 1 on the verdict sheet had the capacity to mislead the jury. The question stated:
Did the defendant, Dr. Ng, deviate from the accepted standard of medical practice in the manner in which she performed the eye surgery which was a proximate cause of the plaintiff, Richard Saks' injury?
Plaintiffs assert that the question was misleading because it referred to "the eye surgery" rather than "anesthesia" and plaintiffs never criticized the manner in which Ng performed the repair of Saks' torn retina.
A jury verdict will not be disturbed if "the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect." Wade v. Kessler Institute, 172 N.J. 327, 341, 798 A.2d 1251 (2002) (quoting from Fischer v. Canario, 143 N.J. 235, 254, 670 A.2d 516 (1996)). The same standard applies to our evaluation of the questions on a verdict sheet. Ibid. (citing Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 467-68, 744 A.2d 1186 (2000)).
In his instructions, the judge stated that plaintiffs were suing Ng "based upon her negligence in the performance of eye surgery." The judge noted that plaintiffs were pursuing two claims in this matter, one of which was for "injuring Richard Saks['] optic nerve during the administration of anesthesia prior to repairing a torn retina. . . ." As we stated previously, the administration of the anesthesia was an integral part of the surgery. Question # 1 properly asked the jury to determine whether Ng was negligent in her performance of the "eye surgery." We are satisfied that the question was unlikely to confuse or mislead the jury.
Affirmed.