JANICE LARGEY AND JOSEPH LARGEY, PLAINTIFFS–APPEL-
LANTS, v. DONALD ROTHMAN, M.D.,
DEFENDANT–RESPONDENT.

Argued November 3, 1986—Decided May 5, 1988.

*Richard B. Ansell* argued the cause for appellants (*Anschelewitz, Barr & Ansell,* attorneys; *Patricia F. Stefanile,* on the brief).

*Robert R. Witt* argued the cause for respondent (*Carton, Nary, Witt & Arvanitis,* attorneys).

PER CURIAM.

This medical malpractice case raises an issue of a patient's informed consent to treatment. The jury found that plaintiff Janice Largey had consented to an operative procedure performed by the defendant physician. The single question presented goes to the correctness of the standard by which the jury was instructed to determine whether the defendant, Dr. Rothman, had adequately informed his patient of the risks of that operation.

The trial court told the jury that when informing the plaintiff Janice Largey of the risks of undergoing a certain biopsy procedure, described below, defendant was required to tell her "what reasonable medical practitioners in the same or similar circumstances would have told their patients undertaking the same type of operation." By answer to a specific interrogatory on this point, the jurors responded that defendant had not "fail[ed] to provide Janice Largey with sufficient information so that she could give informed consent" for the operative procedure. On plaintiffs' appeal the Appellate Division affirmed in

an unreported opinion, noting that the trial court's charge on informed consent followed the holding in *Kaplan v. Haines*, 96 *N.J.Super.* 242, 257 (App.Div.1967), which this Court affirmed on the basis of the Appellate Division's opinion, 51 *N.J.* 404 (1968).

Plaintiffs argued below, and repeat the contention here, that the proper standard is one that focuses not on what information a reasonable doctor should impart to the patient (the "professional" standard) but rather on what the physician should disclose to a reasonable patient in order that the patient might make an informed decision (the "prudent patient" or "materiality of risk" standard). The latter is the standard announced in *Canterbury v. Spence*, 464 *F.*2d 772 (D.C.Cir.), *cert.* den., 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972). The Appellate Division rejected the *Canterbury* standard, not because it disagreed with that standard but because the court felt itself bound, correctly, by the different standard of *Kaplan*, which represents "the latest word" from this Court.

On plaintiffs' petition we granted certification, 104 *N.J.* 415 (1986), to address the correct standard for informed consent. We now discard *Kaplan's* "reasonable physician" standard and adopt instead the *Canterbury* "reasonable patient" rule. Hence, we reverse and remand for a new trial.

I

The narrow issue before us can be placed in satisfactory context by our adopting in pertinent part the Appellate Division's recitation of the facts. In the quoted passage as well as henceforth in this opinion, the word "plaintiff" refers to plaintiff Janice Largey.

In the course of a routine physical examination plaintiff's gynecologist, Dr. Glassman, detected a "vague mass" in her right breast. The doctor arranged for mammograms to be taken. The radiologist reported two anomalies to the doctor: an "ill-defined density" in the subareola region and an enlarged lymph node or nodes, measuring four-by-two centimeters, in the right axilla (armpit). The doctor referred plaintiff to defendant, a surgeon. Defendant expressed concern that the anomalies on the mammograms might be cancer and recom-

mended a biopsy. There was a sharp dispute at trial over whether he stated that the biopsy would include the lymph nodes as well as the breast tissue. Plaintiff claims that defendant never mentioned the nodes.

Plaintiff submitted to the biopsy procedure after receiving a confirmatory second opinion from a Dr. Slattery. During the procedure defendant removed a piece of the suspect mass from plaintiff's breast and excised the nodes. The biopsies showed that both specimens were benign. About six weeks after the operation, plaintiff developed a right arm and hand lymphedema, a swelling caused by inadequate drainage in the lymphatic system. The condition resulted from the excision of the lymph nodes. Defendant did not advise plaintiff of this risk. Plaintiff's experts testified that defendant should have informed plaintiff that lymphedema was a risk of the operation. Defendant's experts testified that it was too rare to be discussed with a patient.

Plaintiff and her husband, who sued *per quod,* advanced two theories of liability * * *. They claimed that they were never told that the operation would include removal of the nodes and therefore that procedure constituted an unauthorized battery. Alternatively, they claimed that even if they had authorized the node excision, defendant was negligent in failing to warn them of the risk of lymphedema and therefore their consent was uninformed. The jury specifically rejected both claims.

## II

The origins of the requirement that a physician obtain the patient's consent before surgery may be traced back at least two centuries. See *Slater v. Baker & Stapleton,* 95 *Eng.Rep.* 860 (K.B.1767). The doctrine is now well-embedded in our law. In *Schloendorff v. The Soc'y of the N.Y. Hosp.,* 211 *N.Y.* 125, 105 *N.E.* 92 (1914), Justice Cardozo announced a patient's right to be free of uninvited, unknown surgery, which constitutes a trespass on the patient: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." 211 *N.Y.* at 129–30, 105 *N.E.* at 93. Earlier case law recognized that theories of fraud and misrepresentation would sustain a patient's action in battery for an unauthorized intervention. *See State v. Housekeeper,* 70 *Md.* 162, 16 *A.* 382 (1889); W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on The Law of Torts* §§ 18, 32 (5th ed. 1984); *see also Pratt v. Davis,* 118 *Ill.App.* 161 (1905)

(physician who excised patient's uterus and ovaries without informing patient of the nature of the operation held liable for assault). Although that cause of action continues to be recognized in New Jersey, *see Perna v. Pirozzi*, 92 *N.J.* 446, 459–63 (1983) (operation on a patient by a surgeon to whom the patient has not given any consent constitutes a battery), there is no "battery" claim implicated in this appeal because the jury determined as a matter of fact that plaintiff had given consent to the node excision performed by Dr. Rothman.

Although the requirement that a patient give consent before the physician can operate is of long standing, the doctrine of *informed* consent is one of relatively recent development in our jurisprudence. It is essentially a negligence concept, predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies. *See In re Conroy*, 98 *N.J.* 321, 346 (1985); *Perna v. Pirozzi, supra*, 92 *N.J.* at 459 (1983); *Canterbury v. Spence, supra*, 464 *F.*2d at 780; *Kaplan v. Haines, supra*, 96 *N.J.Super.* at 255–58.

An early statement of the "informed consent" rule is found in *Salgo v. Leland Stanford, Jr. Univ. Bd. of Trustees*, 154 *Cal.App.*2d 560, 317 *P.*2d 170 (Dist.Ct.App.1957), in which the court declared that "[a] physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment." *Id.* at 578, 317 *P.*2d at 181. *Salgo* recognized that because each patient presents a "special problem," the physician has a certain amount of discretion in dismissing the element of risk, "consistent, of course, with the full disclosure of facts necessary to an informed consent." *Id.* at 578, 317 *P.*2d at 181.

Further development of the doctrine came shortly thereafter, in *Natanson v. Kline*, 186 *Kan.* 393, 350 *P.*2d 1093, modified on

other grounds, 187 *Kan.* 186, 354 *P.*2d 670 (1960), which represented one of the leading cases on informed consent at that time. In *Natanson* a patient sustained injuries from excessive doses of radioactive cobalt during radiation therapy. Even though the patient had consented to the radiation treatment, she alleged that the physician had not informed her of the nature and consequences of the risks posed by the therapy. Thus, the case sounded in negligence rather than battery. 186 *Kan.* at 400–404, 350 *P.*2d at 1100–01. The court concluded that when a physician either affirmatively misrepresents the nature of an operation or fails to disclose the probable consequences of the treatment, he may be subjected to a claim of unauthorized treatment. *Id.* at 406, 350 *P.*2d at 1102. The *Natanson* court established the standard of care to be exercised by a physician in an informed consent case as "limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances." *Id.* at 409, 350 *P.*2d at 1106. At bottom the decision turned on the principle of a patient's right of self-determination:

> Anglo–American law starts with the premise of thorough self-determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment. A doctor might well believe that an operation or form of treatment is desirable or necessary but the law does not permit him to substitute his own judgment for that of the patient by any form of artifice or deception. [*Id.* at 406–07, 350 *P.*2d at 1104.]

After *Salgo* and *Natanson* the doctrine of informed consent came to be adopted and developed in other jurisdictions, which, until 1972, followed the "traditional" or "professional" standard formulation of the rule. Under that standard, as applied by the majority of the jurisdictions that adopted it, a physician is required to make such disclosure as comports with the prevailing medical standard in the community—that is, the disclosure of those risks that a reasonable physician in the community, of like training, would customarily make in similar circumstances. 2 D. Louisell and H. Williams, *Medical Malpractice* § 22.08 at 22–23 (1987) (hereinafter Louisell and Williams). A minority of

the jurisdictions that adhere to the "professional" standard do not relate the test to any kind of community standard but require only such disclosures as would be made by a reasonable medical practitioner under similar circumstances. *Id.* at 22–34. In order to prevail in a case applying the "traditional" or "professional" standard a plaintiff would have to present expert testimony of the community's medical standard for disclosure in respect of the procedure in question and of the defendant physician's failure to have met that standard. *Id.* § 22.09 at 22–35 to –37.

In both the majority and minority formulations the "professional" standard rests on the belief that a physician, and *only* a physician, can effectively estimate both the psychological and physical consequences that a risk inherent in a medial procedure might produce in a patient. The burden imposed on the physician under this standard is to "consider the state of the patient's health, and whether the risks involved are mere remote possibilities or real hazards which occur with appreciable regularity * * *." Louisell and Williams, *supra,* § 22.08 at 22–34. A second basic justification offered in support of the "professional" standard is that "a general standard of care, as required under the prudent patient rule, would require a physician to waste unnecessary time in reviewing with the patient *every* possible risk, thereby interfering with the flexibility a physician needs in deciding what form of treatment is best for the patient." *Ibid.* (footnotes omitted).

It was the "professional" standard that this Court accepted when, twenty years ago, it made the doctrine of informed consent a component part of our medical malpractice jurisprudence. *See Kaplan v. Haines, supra,* 51 *N.J.* 404, aff'g 96 *N.J.Super.* 242. In falling into step with those other jurisdictions that by then had adopted informed consent, the Court approved the following from the Appellate Division's opinion in *Kaplan:*

The authorities * * * are in general agreement that the nature and extent of the disclosure, essential to an informed consent, depends upon the medical

problem as well as the patient. Plaintiff has the burden to prove what a reasonable medical practitioner of the same school and same or similar community, under the same or similar circumstances, would have disclosed to his patient and the issue is one for the jury where, as in the case *sub judice*, a fact issue is raised upon conflicting testimony as to whether the physician made an adequate disclosure. [96 *N.J.Super.* at 257.]

In 1972 a new standard of disclosure for "informed consent" was established in *Canterbury v. Spence, supra*, 464 *F.*2d 772. The case raised a question of the defendant physician's duty to warn the patient beforehand of the risk involved in a laminectomy, a surgical procedure the purpose of which was to relieve pain in plaintiff's lower back, and particularly the risk attendant on a myelogram, the diagnostic procedure preceding the surgery. After several surgical interventions and hospitalizations, plaintiff was still, at the time of trial, using crutches to walk, suffering from urinary incontinence and paralysis of the bowels, and wearing a penile clamp. *Id.* at 778.

The *Canterbury* court announced a duty on the part of a physician to "warn of the dangers lurking in the proposed treatment" and to "impart information [that] the patient has every right to expect," as well as a duty of "reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved." *Id.* at 782. The court held that the scope of the duty to disclose

must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination on treatment, the law must itself set the standard for adequate disclosure. [*Id.* at 786-87 (footnotes omitted).]

The breadth of the disclosure of the risks legally to be required is measured, under *Canterbury*, by a standard whose scope is "not subjective as to either the physician or the patient," *id.* at 787; rather, "it remains *objective* with due regard for the patient's informational needs and with suitable leeway for the physician's situation." *Ibid.* (emphasis added). A risk would be deemed "material" when a reasonable patient,

in what the physician knows or should know to be the patient's position, would be "likely to attach significance to the risk or cluster of risks" in deciding whether to forego the proposed therapy or to submit to it. *Ibid.*

The foregoing standard for adequate disclosure, known as the "prudent patient" or "materiality of risk" standard, has been adopted in a number of jurisdictions. *See Cobbs v. Grant,* 8 *Cal.*3d 229, 104 *Cal.Rptr.* 505, 502 *P.*2d 1 (1972); *Logan v. Greenwich Hosp. Ass'n,* 191 *Conn.* 282, 465 *A.*2d 294 (1983); *Percle v. St. Paul Fire and Marine Ins. Co.,* 349 *So.*2d 1289 (La.App.), *cert.* den., 350 *So.*2d 1218 (1977); *Sard v. Hardy,* 281 *Md.* 432, 379 *A.*2d 1014 (1977); *Congrove v. Holmes,* 37 *Ohio Misc.* 95, 308 *N.E.*2d 765 (1973); *Cooper v. Roberts,* 220 *Pa.Super.* 260, 286 *A.*2d 647 (1971); *Wilkinson v. Vesey,* 110 *R.I.* 606, 295 *A.*2d 676 (1972); *Wheeldon v. Madison,* 374 *N.W.*2d 367 (S.D.1985); *Small v. Gifford Memorial Hosp.,* 133 *Vt.* 552, 349 *A.*2d 703 (1975); *Miller v. Kennedy,* 11 *Wash.App.* 272, 522 *P.*2d 852 (1974); *Cross v. Trapp,* 294 *S.E.*2d 446 (W.Va.1982); *Scaria v. St. Paul Fire and Marine Ins. Co.,* 68 *Wis.*2d 1, 227 *N.W.*2d 647 (1975); Annotation, *Modern Status As to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment,* 88 A.L.R.3d 1998 (1978).

■ The jurisdictions that have rejected the "professional" standard in favor of the "prudent patient" rule have given a number of reasons in support of their preference. Those include:

(1) The existence of a discernible custom reflecting a medical consensus is open to serious doubt. The desirable scope of disclosure depends on the given fact situation, which varies from patient to patient, and should not be subject to the whim of the medical community in setting the standard.

(2) Since a physician in obtaining a patient's informed consent to proposed treatment is often obligated to consider non-medical factors, such as a patient's emotional condition, professional custom should not furnish the legal criterion for measuring the physician's obligation to disclose. Whether a physician has conformed to a professional standard should * * * be important [only] where a pure medical judgment is involved, e.g. in ordinary malpractice actions, where the issue generally concerns the quality of treatment provided to the patient.

(3) Closely related to both (1) and (2) is the notion that a professional standard is *totally* subject to the whim of the physicians in the particular community. Under this view a physician is vested with virtually unlimited discretion in establishing the proper scope of disclosure; this is inconsistent with the patient's right of self-determination. As observed by the court in *Canterbury v. Spence:* "Respect for the patient's right of self-determination * * * demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves."

(4) The requirement that the patient present expert testimony to establish the professional standard has created problems for patients trying to find physicians willing to breach the "community of silence" by testifying against fellow colleagues. [Louisell and Williams, *supra,* § 22.12 at 22–45 to –47 (footnotes omitted).]

Taken together, the reasons supporting adoption of the "prudent patient" standard persuade us that the time has come for us to abandon so much of the decision by which this Court embraced the doctrine of informed consent as accepts the "professional" standard. To that extent *Kaplan v. Haines,* 51 *N.J.* 404, aff'g 96 *N.J.Super.* 242, is overruled.

As indicated by the foregoing passages from Louisell and Williams, the policy considerations are clear-cut. At the outset we are entirely unimpressed with the argument, made by those favoring the "professional" standard, *supra* at 210–11 that the "prudent patient" rule would compel disclosure of *every* risk (not just *material* risks) to *any* patient (rather than the *reasonable* patient). As *Canterbury* makes clear,

[t]he topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated. The factors contributing significance to the dangerousness of a medical technique are, of course, the incidence of injury and the degree of harm threatened. [464 *F.*2d at 787–88.]

The court in *Canterbury* did not presume to draw a "bright line separating the significant [risks] from the insignificant"; rather, it resorted to a "rule of reason," *id.* at 788, concluding that "[w]henever non-disclosure of particular risk information is open to debate by reasonable-minded men, the issue is one for the finder of facts." *Ibid.* The point assumes significance in this case because defendant argues that the risk of lymphedema from an axillary node biopsy is remote, not material. Plain-

tiff's experts disagree, contending that she should have been informed of that risk. Thus there will be presented on the retrial a factual issue for the jury's resolution: would the risk of lymphedema influence a prudent patient in reaching a decision on whether to submit to the surgery?

Perhaps the strongest consideration that influences our decision in favor of the "prudent patient" standard lies in the notion that the physician's duty of disclosure "arises from phenomena apart from medical custom and practice": the patient's right of self-determination. *Canterbury, supra,* 464 *F.*2d at 786–87. The foundation for the physician's duty to disclose in the first place is found in the idea that "it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie." *Id.* at 781. In contrast the arguments for the "professional" standard smack of an anachronistic paternalism that is at odds with any strong conception of a patient's right of self-determination. *Id.* at 781, 784, 789.

Although today's decision marks the first time we have confronted directly the choice between the "professional" and "prudent patient" standards, and hence to that extent our stated preference for the latter represents a clear break with the past, surely the considerations that we have identified as having played a significant role in that choice are familiar features of our case law. For example, just two terms ago we declared that "[t]he doctrine of informed consent presupposes that the patient has the information necessary to evaluate the risks and benefits of all the available options and is competent to do so." *In re Conroy, supra,* 98 *N.J.* at 347.

Moreover, *Canterbury* itself has been cited with approval in a number of New Jersey opinions. *See, e.g., Perna v. Pirozzi, supra,* 92 *N.J.* at 459–60 (quoting *Canterbury's* statements of informed consent, duty to disclose, and material risks); *Skripek v. Bergamo,* 200 *N.J.Super.* 620, 636–38 (App.Div.) (adopting *Canterbury's* objective standard for determining proximate

cause in informed consent cases: " 'in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance,' " *id.* at 637 (quoting *Canterbury,* 464 *F.*2d at 790–91)), certif. den., 102 *N.J.* 303 (1985); *Calabrese v. Trenton State College,* 162 *N.J.Super.* 145, 156 (App.Div.1978) (remarking, on the same page on which it cites *Canterbury* for another proposition, that "the doctor's duty of disclosure is imposed by law and not by medical consensus"), aff'd, 82 *N.J.* 321 (1980). To be sure, the foregoing opinions neither directly conflict with *Kaplan* nor compel *Canterbury,* but they do support the position that our adoption of *Canterbury* would not conflict with those decisions. We therefore align ourselves with those jurisdictions that have adopted *Canterbury's* "prudent patient" standard.

## III

Finally, we address the issue of proximate cause. As with other medical malpractice actions, informed-consent cases require that plaintiff prove not only that the physician failed to comply with the applicable standard for disclosure but also that such failure was the proximate cause of plaintiff's injuries. *See Cheung v. Cunningham,* 214 *N.J.Super.* 649 (App.Div. 1987); *Nicholl v. Reagan,* 208 *N.J.Super.* 644 (App.Div.1986); *Skripek v. Bergamo, supra,* 200 *N.J.Super.* at 636–38.

Under the "prudent patient" standard "causation must also be shown: *i.e.,* that the prudent person in the patient's position would have decided differently if adequately informed." *Perna v. Pirozzi, supra,* 92 *N.J.* at 460 n. 2 (citing *Canterbury, supra,* 464 *F.*2d at 791; Louisell and Williams, *supra,* § 2208 at 22–32 to –35). As *Canterbury* observes,

[t]he patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils. On the other hand, the very purpose of the disclosure rule is to protect the patient against consequences which, if known, he would have avoided by foregoing the treatment. The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination. [464 *F.*2d at 790.]

*Canterbury* decided its own question in favor of an objective determination. The subjective approach, which the court rejected, inquires whether, if the patient had been informed of the risks that in fact materialized, he or she would have consented to the treatment. The shortcoming of this approach, according to *Canterbury,* is that it

> places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk. [*Id.* at 790–91.]

. The court therefore elected to adopt an objective test, as do we. Because we would not presume to attempt an improvement in its articulation of the reasons, we quote once again the *Canterbury* court:

> Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product. [*Id.* at 791.]

In this state the objective test was applied in *Skripek v. Bergamo, supra,* 200 *N.J.Super.* at 636–68, and later in *Nicholl v. Reagan, supra,* 208 *N.J.Super.* at 241, which followed *Skripek's* reasoning. When another panel of the Appellate Division adopted the subjective test in *Cheung v. Cunningham, supra,* 214 *N.J.Super.* at 655 it erred; hence its opinion may no longer be considered persuasive authority.

## IV

The judgment of the Appellate Division is reversed. The cause is remanded for a new trial consistent with this opinion.

*For reversal and remandment*—Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—5.

*Opposed*—None.