**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2307-17T1

DEBORAH HEART AND LUNG
CENTER,

      Plaintiff-Appellant,

v.

VIRTUA HEALTH, INC., VIRTUA
MEMORIAL HOSPITAL
BURLINGTON COUNTY, VIRTUA
MARLTON, RICHARD P. MILLER,
THE CARDIOLOGY GROUP, PA,
CHARLES A. DENNIS, M.D.,
F.A.C.C., JAMES P. O'NEIL, M.D.,
F.A.C.C., RALPH E. RUSSO, III,
M.D., F.A.C.C., and MARK T.
FINCH, M.D.,

      Defendants-Respondents,

and

PALLAVI JADHAV, M.D.,

      Defendant,

and

HARLEYSVILLE

INSURANCE COMPANY OF
NEW JERSEY,

   Defendant/Intervenor-
   Respondent.

_____

         Argued April 3, 2019 – Decided July 16, 2019

         Before Judges Koblitz, Currier and Mayer.

         On appeal from the Superior Court of New Jersey, Law
         Division, Mercer County, Docket No. L-1865-11.

         Anthony Argiropoulos argued the cause for appellant
         (Epstein Becker & Green, PC, attorneys; Anthony
         Argiropoulos and Thomas Kane, on the briefs).

         Philip H. Lebowitz (Duane Morris, LLP) of the
         Pennsylvania bar, admitted pro hac vice, argued the
         cause for respondents Virtua Health, Inc., Virtua
         Memorial Hospital Burlington County, Virtua Marlton,
         and Richard P. Miller (Duane Morris, LLP and Philip
         H. Lebowitz, attorneys; Christopher L. Soriano, Philip
         H. Lebowitz, Seth A. Goldberg, and Trevor H.
         Taniguchi, of counsel and on the brief).

         Michael S. Stein argued the cause for respondents The
         Cardiology Group, PA, Charles A. Dennis, M.D.,
         F.A.C.C., James P. O'Neil, M.D., F.A.C.C., Ralph E.
         Russo, III, M.D., F.A.C.C., and Mark T. Finch, M.D.
         (Pashman Stein Walder Hayden, PC, attorneys;
         Michael S. Stein, Brendan M. Walsh, and Janie S.
         Byalik, on the brief).

         Lance J. Kalik argued the cause for intervenor-
         respondent Harleysville Insurance Company of New

2

Jersey (Riker Danzig Scherer Hyland Perretti, LLP, attorneys; Lance J. Kalik, on the brief).

PER CURIAM

Plaintiff Deborah Heart and Lung Center (Deborah) appeals from May 24, 2017 and January 5, 2018 orders granting summary judgment to defendants Virtua Health, Inc., Virtua Memorial Hospital Burlington County, Virtua Marlton (collectively Virtua), Richard Miller, Virtua's chief executive officer, The Cardiology Group, PA (CGPA), and four of its physicians, Drs. James P. O'Neil, Charles A. Dennis, Ralph E. Russo, III, and Mark T. Finch (collectively, CGPA defendants). We affirm in part and reverse and remand in part.

This dispute involves the business interests of competitors seeking to render medical care to cardiac patients located in the same geographic area of South Jersey. Deborah contends defendants promoted their own financial gain at the expense of patients and failed to protect patient rights.

We provide some background relevant to the relationship among the parties and their dispute related to the care and treatment of cardiac patients. Deborah provides charity care and does not charge its patients for medical treatment. Deborah specializes in the treatment of cardiac patients but has no general emergency room facility. Virtua, a competitor hospital, is located approximately twelve miles from Deborah. It provides emergency room

3

services but lacked a license to perform advanced cardiac procedures. CGPA is a private cardiology group with privileges to treat patients at Virtua. Because Virtua lacked the required cardiac license, CGPA's patients requiring advanced cardiac services had to be transferred to a licensed cardiac facility. A symbiotic relationship among Deborah, the CGPA defendants, and Virtua evolved based on Deborah's ability to perform advanced cardiac procedures and Virtua's capability to provide other healthcare services.

Prior to 2006, Virtua was unable to perform any advanced cardiac procedures, and CGPA patients requiring such procedures had to be transferred from Virtua to another hospital. In 1999, and again in 2002, CGPA and Deborah entered into written physician lease agreements (agreements) whereby Deborah leased cardiologists employed by it to CGPA. The leased cardiologists provided cardiac services for CGPA patients at Deborah. Pursuant to these agreements, CGPA paid Deborah a fee for the cardiac services provided by its cardiologists, the patients remained CGPA patients, and CGPA billed the patients for the services performed by the Deborah cardiologists.

Dr. Charles A. Dennis, a Deborah cardiologist, was leased to CGPA pursuant to the agreements to perform advanced cardiac procedures. Dr. Dennis received the majority of CGPA's patient referrals. In 2003, Virtua was granted

4

a license to perform low-risk cardiac catheterizations. At that time, with Deborah's consent, Dr. Dennis was granted privileges at Virtua to perform cardiac catheterizations and became Virtua's cardiac catheterization laboratory director.

In June 2006, Dr. Dennis resigned from Deborah and joined CGPA as a full-time employee. He maintained privileges at both Deborah and Virtua. As a CGPA employee, Dr. Dennis performed cardiac procedures at Virtua, and CGPA no longer needed to lease cardiologists from Deborah. As a result, in August 2006, CGPA terminated its agreements with Deborah.

On February 20, 2007, Deborah suspended Dr. Dennis's privileges at its hospital. Dr. Dennis was told the suspension was based on an external review that concluded he was a danger to patients. Dr. Dennis believed his suspension was directly related to his outspoken criticism of Deborah's failure to maintain a cutting-edge heart program.

Deborah knew suspending Dr. Dennis would cause it to lose CGPA patient referrals. Deborah acknowledged Dr. Dennis was the link between CGPA and Deborah, but "chose to give up that business" when it revoked his privileges. Immediately after Deborah suspended Dr. Dennis, administrative personnel at

Deborah were contacted by CGPA doctors, demanding Dr. Dennis be reinstated or else Deborah would not receive CGPA patient referrals.

Deborah's suspension of Dr. Dennis prompted CGPA to seek an affiliation with another hospital licensed to perform advanced cardiac procedures. In 2007, CGPA partnered with Pennsylvania Presbyterian Hospital (Penn) for cardiac services even though Penn was located slightly further from Virtua than Deborah. Prior to 2007, CGPA sent eighty-five percent of its advanced cardiac care patients to Deborah and fifteen percent of such patients to Penn. After 2007, seventy percent of CGPA cardiac patients went to Penn for cardiac procedures and thirty percent went to Deborah.

Virtua claims it had no role in CGPA's decision to enter into the agreements with Deborah. Nor was Virtua involved in CGPA's decision to hire Dr. Dennis. Virtua also disavowed involvement in the discussions between patients and their physicians regarding transfer to another hospital. In fact, Virtua had a written policy that a patient's transfer to another hospital was a decision made by the physician and the patient, reflecting the physician's medical judgment and patient's preference. Virtua patients were required to sign a consent form prior to transfer to another medical facility for care and treatment.

6                                                                    A-2307-17T1

In the years preceding this litigation, several hospitals in the South Jersey area were competing for cardiac patients, including Deborah. With the goal of improving its financial situation, and increasing its pool of advanced cardiac patients, Deborah had discussions with several hospitals about forming an affiliation. In 2004, 2007, and 2008, Deborah and Virtua explored a possible association but never reached an agreement.

In 2006, Dr. Dennis wrote to administrators at Virtua, touting a "white knight" strategy to gain cardiac services and cardiac patients. Believing Deborah was experiencing a critical financial situation, jeopardizing Deborah's ability to remain open, Dr. Dennis developed a plan for Virtua to partner with Deborah. The mutual benefit from such a partnership would have been Virtua's ability to perform advanced cardiac surgical procedures and Deborah's receipt of a predictable and steady stream of cardiac patients.

After affiliation discussions between the hospitals proved unsuccessful, CGPA believed Deborah's financial situation was dire and Deborah would have no choice but to close its doors. Some CGPA doctors were opposed to an affiliation between Virtua and Deborah and preferred to see Deborah shut down.

Around this time, CGPA suspected Deborah was competing for cardiac patients in the same geographic area of Burlington and Camden counties.

A-2307-17T1

According to Dr. Dennis, Deborah planned to open its own cardiology practice with an office located near one of CGPA's office sites.

In 2009, Deborah filed suit against defendants alleging tortious interference with prospective economic advantage, civil conspiracy, unfair competition, and defamation-styled claims. The complaint was premised upon allegations by twenty-seven identified CGPA patients (identified patients), asserting they were transferred from Virtua to Penn for cardiac procedures contrary to their stated preference to be transferred to Deborah.[1]

In October 2011, Deborah filed a second amended complaint. The amended complaint asserted the same claims against defendants but added additional unidentified cardiac patients transferred from Virtua to Penn or other hospitals between 2007 and 2011 (unidentified patients).[2]

Deborah alleged defendants collaborated in a scheme to drive Deborah out of business by directing cardiac patients to hospitals other than Deborah. In support of its theory, Deborah relied on testimony regarding patients who

---

[1] The number of identified patients increased from twelve to twenty-three to twenty-seven over the course of the litigation.

[2] According to documents produced by the ambulance company responsible for the transportation of the unidentified patients, over 1700 cardiac patients were transferred from Virtua to Penn between 2007 and 2011.

A-2307-17T1

wished to be transferred from Virtua to Deborah for advanced heart-related procedures. Deborah asserts that the failure to transfer these critically ill patients to it as the nearest hospital to Virtua was improper, a violation of medical ethics and standards, and contrary to the doctrine of informed consent.

There are two distinct groups of patients whose rights were violated by defendants according to Deborah: twenty-seven identified patients and 1700 unidentified patients. We analyze Deborah's claims related to both patient groups.

The twenty-seven identified patients went to Virtua's emergency room with heart-related complaints after 2007, when CGPA had an affiliation agreement with Penn. The identified patients requested a transfer from Virtua to Deborah for their required cardiac procedures. The identified patients claim they received false, disparaging, and misleading information about Deborah and were transferred to Penn against their wishes.

One identified patient protested her transfer from Virtua to Penn and was told Deborah's beds were full and CGPA was no longer affiliated with Deborah. Another identified patient explained she wished to be transferred to Deborah because Deborah's care was free, but was transferred to Penn over her objection. Other identified patients claimed they requested to be transferred to Deborah

A-2307-17T1

because of a prior positive experience at Deborah, no-cost healthcare at Deborah, or geographic proximity of Deborah to their home.

Some identified patients testified they were told there was a new agreement between CGPA and Penn and there were no beds available at Deborah. These patients also were allegedly told by CGPA that many physicians had left Deborah, Deborah was about to shut its doors, Penn was a better hospital than Deborah, and CGPA doctors recommended transfer to Penn. The identified patients stated they were not advised of transfer hospital options for their advanced heart procedures.

The CGPA defendants provided deposition testimony and submitted certifications refuting Deborah's allegations regarding the identified patients. The CGPA doctors averred that hospital transfers were discussed with the patient and the transfer decision was dependent upon the patient's condition, the risks associated with the transfer, and the cardiac procedure required.

The CGPA doctors explained it was not their policy to discuss alternative hospitals with the patient. Nor did the doctors believe discussing available hospital options was part of the required discussion between a physician and a patient. According to CGPA, if a patient requested to be transferred to a

different hospital rather than the recommended facility, the doctor would attempt to honor the patient's request.

CGPA further stated that the majority of cardiac patients transferred from Virtua to another hospital were not facing life threatening heart conditions. To the contrary, CGPA claimed only a small number of their critically ill patients were transferred from Virtua to Penn.

CGPA also denied telling patients that Deborah was closing, that CGPA no longer sent patients to Deborah, or that Deborah had no available beds. While many of CGPA's physicians believed Deborah's quality of cardiac care was not as good as Penn's heart rescue program, the doctors agreed that if the patient requested transfer to Deborah, the patient would go to Deborah if the doctor deemed the transfer appropriate based on the patient's medical condition.

Virtua representatives also provided testimony and affidavits refuting Deborah's allegations. Virtua asserted it had no policy preventing a patient from being transferred to Deborah or any other hospital.

The parties exchanged discovery between 2009 and 2013. In 2014, the judge re-opened discovery to allow Deborah to gather additional evidence in support of its claims related to the unidentified patients. Deborah obtained records from Virtua's ambulance company of patient transfers between 2007 to

2011. These records enabled Deborah to contact the unidentified patients to obtain evidence in support of its claims.

Instead of conducting discovery based on the ambulance records, Deborah relied on a random telephone survey, purporting to establish patients preferred to be transferred from Virtua to Deborah instead of Penn or another hospital. The survey asked an open-ended question regarding which hospital the survey respondent would select for treatment of a serious cardiac problem. When the individual responded to this question, Deborah and Virtua each received a twenty-five percent favorable response. The surveyed individuals were then given hypothetical information, purportedly relating to informed consent disclosures such as the costs associated with the transfer hospital, the geographic location of the transfer hospital, the physician's affiliation with the transfer hospital, and the assumption that the individual had a life threatening heart condition, requiring immediate transport to the nearest facility. When this information was incorporated into the survey, between seventy-three percent and eighty-one percent of those surveyed selected Deborah as the preferred hospital for transfer. Based on the survey results, Deborah's damages expert calculated Deborah lost $26,309,192 in patient transfers from Virtua between 2007 and 2012.

Deborah also retained several experts who opined that a physician is required to discuss transfer hospital alternatives in procuring a patient's informed consent prior to a transfer. Dr. Eric Stander opined Deborah had an important advantage over Penn because of its closer proximity to Virtua. He stated this factor was probative information that should have been conveyed to the patient as part of the informed consent discussion. Deborah's tortious interference claim related to the identified and unidentified patients was based on the failure of the CGPA defendants and Virtua to disclose Deborah as an alternative transfer hospital in violation of the Hospital Patients Bill of Rights Act (Act), N.J.S.A. 26:2H-12.8(j),[3] and the doctrine of informed consent.

After discovery closed, defendants filed motions for partial summary judgment on the tortious interference with prospective economic advantage claims related to the unidentified patients. On May 24, 2017, the judge granted partial summary judgment to defendants. On that same date, the judge dismissed

---

[3] The Act provides a patient admitted to a hospital licensed by the Department of Health has the right "[t]o be informed by the hospital of the necessity of transfer to another facility prior to the transfer and of any alternatives to it which may exist, which transfer shall not be effected unless it is determined by the physician to be medically necessary . . . ." The Act does not allow a patient to pursue a private cause of action against a hospital. See Castro v. NYT Television, 370 N.J. Super. 282, 294 (App. Div. 2004).

the disparagement claims against the CGPA defendants because Deborah conceded it did not have a viable cause of action for defamation, slander, or injurious falsehood.

In granting partial summary judgment, the judge held Deborah failed to establish "the predicate wrongful conduct to pursue business tort claims." The judge determined that neither the doctrine of informed consent, nor any other theory advanced by Deborah's experts, required defendants to disclose Deborah as an alternative transfer hospital.

In rejecting the informed consent claim, the judge found, "[t]he informed consent doctrine is to protect patient's rights for self-determination, not to protect market share or to foster competition." The judge noted, "[t]here are no cases saying that informed consent includes a doctor's disclosure of alternative facilities." Relying on Largey v. Rothman, 110 N.J. 204 (1988), the judge explained the information that must be imparted by a physician to a patient includes "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated."

Regarding Deborah's claim that defendants violated the Act by failing to disclose alternative transfer hospitals, the judge stated:

The language of the statute requires doctors to inform patients of the names of potential alternative transfer facilities or transportation times. New Jersey Patient Bill of Rights does not provide a right of action. It is intended to protect patients, not other hospitals. Nothing in reading the statute and [the] rules of construction . . . support[s] [Deborah's] position that the statute requires a doctor to inform patients of any material alternative transfer facilities to which patients could be sent.

The judge also determined Deborah's informed consent claim was inapplicable as to the 1700 unidentified patients on a class-wide basis. He concluded:

> In Largey, the Court held that . . . "[t]he desirable scope of the disclosure depends on the given fact situation which varies from patient to patient . . . ." Deborah's business tort claim fails as a matter of law because its claims relating to the unidentified patients turns on its contention that CGPA doctors were required to provide exactly the same disclosures to each one of the 1,700 unidentified patients, and that is not possible since the type and scope of the disclosure required by law varies from patient to patient informed by the particular circumstances presented.
>
> . . . .
>
> To the extent that Deborah's experts contend that the scope of the disclosure for each of the unidentified patients can be determined without any individualized inquiry into each patient's individual medical condition and personal circumstance, that is patently wrong . . . . Patient-specific issues are primary here, very different cardiac issues, different personal circumstances. Some procedures are elective, some are emergent . . . .

In analyzing the tortious interference with prospective economic advantage claim, the judge concluded Deborah had no protectable interest in receiving patients that was superior to the right of other hospitals to receive these same patients. He explained:

> The undisputed evidence shows that once the contractual relationship between CGPA and Deborah terminated in 2006 . . . Deborah had no more reason to expect CGPA referrals than any of the six other hospitals in competition with Deborah for CGPA patients, so Deborah's claim for tortious interference with respect to economic advantage must fail since it had no greater right than the other hospitals competing with Deborah.

The judge also rejected Deborah's claim that the CGPA defendants engaged in unfair competition by discouraging the unidentified patients from transferring to Deborah. He held "[t]he unfair competition claim fails because CGPA and the individual cardiologists are in fact not in competition with Deborah . . . . Deborah is a specialty hospital. They're not in competition with CGPA which is a private cardiology group."

In addition, the judge dismissed Deborah's civil conspiracy claim against the CGPA defendants related to the unidentified patients. He noted there was "not a single piece of evidence cited by Deborah that can even be construed as evidence of a conspiracy" to harm Deborah. As the judge explained, "[s]ince

16

Deborah can show no tortious conduct regarding the unidentified patients . . . the conspiracy claim would fail . . . ."

The judge also concluded Deborah's survey related to the unidentified patients was flawed because the assumptions in the survey questions were unsupported by the record. He found the survey improperly presumed certain physician-patient disclosures were legally required under the informed consent doctrine despite the lack of any medical requirement compelling those disclosures. The judge also found the survey improperly relied on hypothetical situations lacking any factual foundation in the record, such as the need to complete hospital transfers to the nearest hospital as quickly as possible because every unidentified patient was critically ill. The judge also noted the record was devoid of discussions between doctors and any of the unidentified patients.

The judge concluded Deborah's tortious interference claim against Virtua and Miller as to the unidentified patients also failed. The judge found Deborah provided no evidence that Virtua was involved in discussions between the CGPA defendants and patients regarding transfer hospital destinations. Based on the unrefuted evidence, such discussions were exclusively between the doctor and the patient. The judge determined Virtua's role in the hospital transfer process

17

was limited to carrying out the doctor's transfer instructions and requiring the patient to sign the necessary transfer form.

The judge also rejected Deborah's unfair competition claim against Virtua related to the unidentified patients. He concluded the relationship between Virtua and Penn was no different than the prior relationship between Virtua and Deborah. Nor did he find anything improper in Virtua exploring an opportunity to affiliate with Deborah. The judge explained that the "white knight" strategy was not indicative of unfair competition because "[a] white knight rescues a distressed enemy from distressed conditions."

On the civil conspiracy claims against Virtua related to the unidentified patients, the judge stated, "there is not a single piece of evidence cited by Deborah that can even be construed as evidence of a conspiracy involving Virtua to take any action to harm Deborah . . . ." He further found, "[n]othing in the cited emails or testimony suggests that Virtua engaged [in] or intended to engage in malicious or unlawful conduct directed at Deborah . . . ."

As to Miller, Virtua's chief executive officer at the time, the judge concluded he was not involved in any wrongful or tortious conduct. The judge found, "[t]here's simply no credible evidence in the record that Miller

participated actively in a tortious act, nor . . . are there any tortious acts as a matter of law."

Deborah filed a motion for reconsideration from the orders granting partial summary judgment and dismissing its claims related to the unidentified patients. At the same time, the CGPA defendants, Virtua, and Miller moved for summary judgment on Deborah's claims related to the identified patients. On January 5, 2018, the judge denied Deborah's motion for reconsideration and granted defendants' motions to dismiss the claims related to the identified patients.

In granting summary judgment to defendants on Deborah's claims as to the identified patients, the judge made similar rulings as he had regarding unidentified patients. The judge also noted dismissal was proper because there were no identified patients named as parties in the litigation.

In addition, the judge concluded there was no requisite third party to any prospective economic relationship for Deborah to prevail on its tortious interference claim. The judge stated:

> CGPA was the sole source of the referrals of their patients that plaintiff claims it should have received, so clearly CGPA was an essential party to the [prospective] referrals . . . . CGPA was the link between plaintiff and the patients who were CGPA's patients.

> Even if an . . . interference with business relations claim is applicable, summary judgment still must be granted since CGPA is an essential entity to the purported injured relations between its patients and plaintiff. And CGPA was the source . . . of the business opportunity allegedly interfered with.
>
> . . . .
>
> The record before the [c]ourt, even giving all inferences to plaintiff, is that GCPA had both an economic and beneficial interest in where their patients were transferred. Either one of these interests makes plaintiff's claim fatally flawed and subject to summary judgment.

On appeal, Deborah contends the judge erred in dismissing its claims. In addition, Deborah argues the judge erred in declining to conduct a N.J.R.E. 104 hearing prior to granting summary judgment. Further, Deborah claims the order dismissing the disparagement claims was overly broad and restricted its ability to present evidence in support of its claims.

We review a trial court's decision to grant or deny a motion for summary judgment de novo, using the same standards applied by the motion judge. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). We first determine "whether there is a genuine issue for trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); R. 4:46-2(c). "If there is no genuine issue of fact, we then decide

whether the [trial court's] ruling on the law was correct." Lebron v. Sanchez, 407 N.J. Super. 204, 213 (App. Div. 2009). "A party cannot defeat a motion for summary judgment merely by submitting an expert's report in his or her favor." Brill, 142 N.J. at 544 (holding an expert's opinion "based on a factually inaccurate and unjustifiable assertion . . . does not create a genuine issue of material fact precluding the grant of summary judgment"); see also Townsend v. Pierre, 221 N.J. 36, 55 (2015) ("A party's burden of proof on an element of a claim may not be satisfied by an expert opinion that is unsupported by the factual record or by an expert's speculation that contradicts that record.").

We first examine dismissal of Deborah's claim for tortious interference with prospective economic advantage. To prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must show (1) some protectable right, some existence of a reasonable expectation of economic advantage, such as a prospective economic or contractual relationship; (2) an intentional and malicious interference with that expectation; (3) a causal connection between the interference and the loss of the prospective gain; and (4) damages. See Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989). An action for tortious interference with prospective economic advantage protects a business from the luring away of its customers by improper

means. Id. at 750. It is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim "be directed at defendants who are not parties to the relationship." Id. at 752.

The relationship between Deborah and CGPA was based on CGPA's need to send cardiac patients to a hospital licensed to perform such procedures because Virtua lacked the necessary license. Deborah and CGPA entered into agreements whereby Deborah leased cardiologists to CGPA to perform the required medical procedures for CGPA patients. During the time the agreements were in effect, Deborah received eighty-five percent of CGPA's patient referrals. After 2006, when the agreements were terminated, Deborah still received thirty percent of CGPA's patient referrals.

Absent any agreement between Deborah and CGPA to transfer patients, Deborah had no reasonable expectation that such patients would continue to be referred to it. A prior contractual agreement to form a business relationship does not constitute a basis for a prospective economic relationship claim. See Printing Mart, 116 N.J. at 754-55; see also Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc., 282 N.J. Super. 140, 199 (App. Div. 1995) ("[W]here a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury.").

Nor were CGPA and Virtua third parties to the patient transfer arrangement. It is fundamental to a cause of action for tortious interference with prospective economic advantage that the claim be directed at defendants who are not parties to the existing economic relationship. See Printing Mart, 116 N.J. at 752. Here, the CGPA defendants and Virtua were essential parties to the transfer of patients from Virtua to Deborah based on the agreements prior to 2006. Deborah's expectation it would receive cardiac patient transfers from Virtua was based on those agreements. After the agreements were terminated, Deborah could not expect the continued receipt of CGPA cardiac patients from Virtua.

Having reviewed the record, we are satisfied the judge correctly determined Deborah could not succeed on its claims for tortious interference with prospective economic advantage. CGPA was the link between the patients and Deborah and therefore CGPA was not a third party in the transfer of its patients from Virtua. Further, after the agreements between Deborah and CGPA were terminated, Deborah had no reasonable expectation of any economic interest in the continued transfer of CGPA's patients who required advanced cardiac procedures.

Nor can Deborah prevail on its tortious interference claim grounded on informed consent. Deborah contends the actions of the CGPA defendants and Virtua constituted a denial of the patients' informed consent regarding the transfer hospital destination.

The doctrine of informed consent obligates physicians to disclose material risks inherent in a procedure or course of treatment so the patient may make an informed decision. Matthies v. Mastromonaco, 160 N.J. 26, 36 (1999); Largey, 110 N.J. at 211-12. Under the doctrine, the physician is required to advise the patient of "all medical information that a reasonably prudent patient would find material[,]" Acuna v. Turkish, 192 N.J. 399, 415 (2007), and "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated." Largey, 110 N.J. at 213 (quoting Canterbury v. Spence, 464 F.2d 772, 787-88 (D.C. Cir. 1972)). Doctors have no obligation to provide information unrelated to the "procedure, its substantial risks, and alternatives . . . ." Howard v. Univ. of Med. and Dentistry of N.J., 172 N.J. 537, 557 (2002) (finding doctors had no duty to detail their medical experience as part of the informed consent discussion); see also Blazoski v. Cook, 346 N.J. Super. 256, 269-70 (App. Div. 2002) (declaring

"[a]ctions for informed consent are limited to the nondisclosure of medical information.").

The doctrine of informed consent does not accord a basis for Deborah's claims in this case. A physician is not required to discuss with a patient where medical treatment will be performed or to present various options as to different treatment facilities. While a patient may want to consider the distance from his or her home to the transfer hospital or the costs related to a transfer to a more distant hospital, the failure of a physician to address such non-medical information is not contrary to the doctrine of informed consent. We see no reason to expand the doctrine of informed consent to impose an obligation on a doctor to counsel a patient on non-medical information regarding all medical facilities available for treatment.

We also reject Deborah's attempt to apply the doctrine of informed consent to the unidentified patients because the scope of the required disclosures is fact-specific and necessarily "varies from patient to patient." Largey, 110 N.J. at 212 (quoting D. Louiseu and H. Williams, Medical Malpractice § 22.12 at 22-45 to -47 (1987)). There is no evidence in the record indicating what information, if any, was provided to the unidentified patients by the CGPA defendants or Virtua. Nor does the record disclose the medical circumstances

of each unidentified patient. Deborah's random survey assumed, without actual evidence or review of any medical records, that each of the 1700 unidentified patients was seriously ill and required immediate medical attention at the nearest hospital facility. Based on the unique nature of each patient's medical circumstance, including the patient's prior medical history, the nature of the procedure required, and the relationship with the treating doctor, courts have declined to expand the doctrine of informed consent to claims asserted on a class-wide basis. See Hum v. Dericks, 162 F.R.D. 628, 640 (D. Hawaii 1995) (quoting Harrigan v. United States, 63 F.R.D. 402, 405 (E.D. Pa. 1974) (rejecting an informed consent claim on behalf of dozens of patients who underwent surgery with a non-FDA approved ligament because "[a] determination of informed consent in each case depends on a separate inquiry into the facts surrounding each operation and an application of the facts to the governing legal principles"); Harrigan, 63 F.R.D. at 405-07 (holding questions relating to veterans' informed consent for urinary tract surgery performed at a Veteran's Administration hospital had to be determined on the basis of the facts relevant to each individual case and rejecting informed consent claims on behalf of the proposed class of veterans)).

26

Having reviewed the record, we are satisfied the judge properly rejected Deborah's informed consent claims as to the unidentified patients based on the absence of evidence as to the medical circumstances of each unidentified patient and the discussion between the unidentified patient and the doctor.

Deborah also contends the trial judge erred in refusing to conduct a Rule 104 hearing regarding the expert opinion testimony of Dr. Stander. A Rule 104 hearing allows a court to assess an expert's opinion prior to trial to determine if the testimony is grounded on scientifically sound reasoning and methodology or is based on the expert's self-validating, unsubstantiated personal belief. See In re Accutane, 234 N.J. 340, 390-91 (2018).

However, Deborah never sought a Rule 104 hearing despite the judge establishing a deadline to request a hearing. Nor did defendants challenge the reliability of Dr. Stander's methodology, which would require a Rule 104 hearing. Instead, defendants argued there was no factual basis in the record to support Dr. Stander's opinions regarding the life threatening conditions of the unidentified patients and the requirement that the unidentified patients be transported to the nearest hospital as quickly as possible.

Under the circumstances, there was no need to conduct a Rule 104 hearing. Moreover, Deborah told the trial judge that Rule 104 hearings were unnecessary

27

because "[t]he expert issues . . . have been explored very, very deeply over the course of the summary judgment motion practice." Because Deborah conceded there was no need to conduct an evidentiary hearing on the admissibility of their own expert's testimony, we are satisfied the judge did not err by failing to conduct a Rule 104 hearing.

We next consider the summary judgment dismissal of Deborah's unfair competition claim. "[T]he essence of unfair competition is fair play." Ryan v. Carmona Bolen Home for Funerals, 341 N.J. Super. 87, 92 (App. Div. 2001) (alteration in original) (quoting Columbia Broad. Sys. v. Melody Recordings, 134 N.J. Super. 360, 376 (App. Div. 1975)). "[T]he purpose of the law regarding unfair competition is to promote higher ethical standards in the business world." Ibid. (citing N.J. Optometric Ass'n v. Hillman-Kohan, 144 N.J. Super. 411, 427 (Ch. Div. 1976)). "The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently flexible to accommodate those goals." Ibid.

Deborah argues the judge erred in granting summary judgment on its unfair competition claim when he concluded Deborah and CGPA were not competitors. Having reviewed the record, there was evidence presented regarding competition among the parties for cardiac patients because Deborah

employed cardiologists who saw private patients in medical offices similar to CGPA. In addition, Dr. Dennis testified that Deborah had become a competitor of CGPA in soliciting cardiac patients. Based on the conflicting testimony and certifications describing the competition for cardiac patients, there were genuinely disputed material facts precluding summary judgment on Deborah's unfair competition claim. The jury should determine if any of the actions or statements by defendants were undertaken as part of an effort to deprive Deborah of cardiac patients, resulting in unfair competition.[4]

We next examine the dismissal of Deborah's civil conspiracy claim. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act" resulting in damages. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)). "To establish a conspiracy, 'it simply must be shown that there was a "single plan, the essential nature and general scope of which [was] known to each person

---

[4] For the reasons previously expressed in this opinion, Deborah's surviving claims are limited to the identified patients as the claims advanced on behalf of the unidentified patients are speculative and lack support in the record.

who is to be held responsible for its consequences."'" Morgan, 268 N.J. Super. at 365 (alteration in original) (quoting Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979)). A court will find a civil conspiracy where the purported conspirator understood "the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." Gandi, 184 N.J. at 177 (quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988)).

Our review of the record reveals email exchanges, deposition testimony, and certifications suggesting defendants collectively worked to shutter Deborah. It is for a jury to determine whether defendants formed a plan to close Deborah by sending cardiac patients to other hospitals. If defendants engaged in misleading practices related to Deborah's unfair competition claim, the jury could also find a civil conspiracy among defendants to hasten the fiscal ruin of Deborah, and force the hospital to close its doors. There are material factual disputes related to defendants' formulation of a plan to put Deborah out of business by depriving Deborah of patients, deliberately discouraging patients from transferring to Deborah, and making disparaging comments about the quality of care at Deborah that precluded summary judgment on Deborah's civil conspiracy claim.

We also review the judge's dismissal of Deborah's disparagement claims against the CGPA defendants. Deborah argues the language dismissing the disparagement claims may preclude it from presenting evidence at trial.

In reviewing the order dismissing the disparagement claims, we fail to ascertain any language that would preclude Deborah from presenting evidence in support of its surviving claims. Nor does Deborah explain how it would be prejudiced from presenting evidence based on the language in that order.

Affirmed as to dismissal of Deborah's claims against defendants for tortious interference with prospective economic advantage. Affirmed as to dismissal of Deborah's disparagement claims against the CGPA defendants. Reversed and remanded as to Deborah's claims against defendants for unfair competition and civil conspiracy limited to the identified patients.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31                                          A-2307-17T1